DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant/Defendant, Jason W. Serva, appeals his conviction in the Summit County Court of Common Pleas. We affirm. *Page 2 
 {¶ 2} Defendant was convicted by a jury of one count of kidnapping, in violation of R.C. 2905.01(A)(4), a first degree felony; two counts of rape, in violation of R.C. 2907.02(A)(2), first degree felonies; and misdemeanor assault, in violation of R.C. 2903.13. Co-defendant, Derrick Castleberry was tried jointly with Defendant and was convicted of rape but was acquitted of a kidnapping charge. Two other individuals (Mark Dick and Kenta Mingo) were also jointly tried with Defendant but acquitted of both rape and kidnapping charges. The charges against Defendant and co-defendants stemmed from an incident that occurred on March 16, 2005, at a commercial property located on N. Main Street in Akron, Ohio, which incident the victim reported to the police on March 18, 2005.
 {¶ 3} Defendant was sentenced on June 22, 2006, to a total term of 17 years imprisonment and adjudicated a sexually oriented offender. Defendant appeals his conviction, raising one assignment of error.
 Assignment of Error
"Appellant's convictions were against the manifest weight of the evidence."
 {¶ 4} Defendant asserts that his convictions were against the manifest weight of the evidence as the evidence presented at trial demonstrates that the victim voluntarily accompanied Defendant and engaged in consensual sex. Defendant further asserts that co-defendant Mingo's testimony about Defendant's *Page 3 
conduct was exculpatory and the jury must have believed co-defendant Mingo because he was acquitted.
 {¶ 5} Manifest weight is a question of fact. State v. Thompkins
(1997), 78 Ohio St.3d 380, 387. If the trial court's judgment was against the manifest weight of the evidence, then an appellate panel may reverse the trial court. Id. In the special case of a jury verdict, however, the panel must be unanimous in order to reverse. Id. at paragraph four of the syllabus, citing Sec. 3(B)(3), Art. IV, Ohio Const. Because reversal on manifest weight grounds is not a question of law, it is not an acquittal but instead is akin to a deadlocked jury from which retrial is allowed. Id. at 388, citing Tibbs v. Florida
(1982), 457 U.S. 31, 43. Under this construct, the appellate panel "sits as the `thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony," id., finding that the State has failed its burden of persuasion.
 {¶ 6} In a manifest weight analysis, an appellate court essentially undertakes a three-step, sequential inquiry: (1) whether the State's account was believable based upon the evidence; (2) and if so, whether it was more believable than the defendant's version of the evidence; (3) but if not, whether the State's case was so unbelievable or unpersuasive as to undermine the integrity of the jury's finding of guilt and cause one to question whether justice was done. See State v. Getsy (1998),84 Ohio St.3d 180, 193. Obviously, "[a] conviction is not against the manifest weight of the evidence merely because there is conflicting evidence before the trier of fact." State v. Urbin, 148 Ohio App.3d 293, 2002- *Page 4 
Ohio-3410, ¶ 26, quoting State v. Haydon (Dec. 22 1999), 9th Dist. No. 19094, at 14.
 {¶ 7} In step (1) an appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses[,] and * * * resolve[s] conflicts in the evidence." Thompkins, 78 Ohio St.3d at 387. Step (2) "concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Internal quotations and emphasis omitted.) State v. Smith (1997),80 Ohio St.3d 89, 113. "Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis omitted.)Thompkins, 78 Ohio St.3d at 387. And in completing step (2), "[a] court reviewing questions of weight is not required to view the evidence in a light most favorable to the prosecution, but may consider and weigh all of the evidence produced at trial." Id. at 390 (Cook, J., concurring).
 {¶ 8} Step (3) dictates that an appellate court may not merely substitute its view for that of the jury, but must find that "the juryclearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Emphasis added.) Id. at 387. See, also, id at 390 (Cook, J., concurring) (stating that the "special deference given in a manifest-weight review attaches to the conclusion reached by the trier of fact"). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." Id. at 387. In application, this may be stated as "[a court] will not overturn a judgment based *Page 5 
solely on the fact that the jury preferred one version of the testimony over the other." State v. Lee, 158 Ohio App.3d 129, 2004-Ohio-3946, ¶ 15.
 {¶ 9} Based on a review of the record, this Court finds it reasonable that the jury could have believed the testimony and evidence proffered by the State.
 {¶ 10} Appellant was convicted of two counts of rape, a violation of R.C. 2907.02(A)(2), felonies of the first degree and one count of kidnapping, a violation of R.C. 2905.01(A)(4), a felony of the first degree. R.C. 2907.02(A)(2) provides:
 "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."
 {¶ 11} R.C. 2905.01 governs kidnapping and states:
 "(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 * * *
 "(4) To engage in sexual activity, as defined in section 2901.07 of the Revised Code, with the victim against the victim's will[.]"
 {¶ 12} Sexual conduct or sexual activity is defined as
 "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between person regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A). *Page 6 
 {¶ 13} Defendant was also convicted of misdemeanor assault, in violation of R.C. 2903.13, which states: "No person shall knowingly cause or attempt to cause physical harm to another * * * [or] [n]o person shall recklessly cause serious physical harm to another." R.C. 2903.13(A) and (B).
 {¶ 14} The jury heard testimony from 12 witnesses. The State produced Chris Klingensmith, Kenneth Dies, John Rowan, Crystal Hackett, Jason Miles, Ronald Kennedy, Chad Britton, Lynda Eveleth, Russ McFarland, and the victim. Co-defendant Castleberry produced Eddie Ali. Co-defendant Mingo testified in his own defense. The Defendant did not testify or produce any witnesses.
1. Nurse Klingensmith
 {¶ 15} Chris Klingensmith is an R.N. with the SANE (sexual assault nurse examiner) unit at St. Thomas Hospital, who examined the victim after the victim was referred to the unit by the police.
 {¶ 16} The victim told her that she had been assaulted by 4 people that she identified as Jason, Mark, someone with the first initial of "D" and an unknown person. The victim described the incident in great detail, which detail is contained in narrative form in her report, which narrative was read into the record. Ms. Klingensmith testified that the victim's narrative indicated that some of the details of the incident were cloudy. Besides the various sexual acts, the victim also indicated that she was hit with a belt on her buttocks during the assault. Her injuries did not require treatment. *Page 7 
 {¶ 17} Ms. Klingensmith took pictures of the victim. The pictures demonstrated that the victim had a scratch on her upper left arm, a scrape on her upper right arm, a scratch on her right lower leg, a rectangular shaped bruise on her buttocks, two small scrapes in the external genital area, and a small laceration on the cervix. Ms. Klingensmith testified that the victim's injuries were consistent with the incident as described by the victim but that they could also be consistent with consensual sex. She acknowledged on cross-examination that she could not determine when the victim received these injuries and that she cannot tell if the bruise on the victim's buttock was caused by a strike with a belt.
 {¶ 18} Ms. Klingensmith utilized a rape kit to obtain further evidence from the victim. She took blood samples, head and pubic hair samples, and vaginal and rectal swabs of the victim. She also took swabs of the victim's underwear, which was not the same underwear the victim was wearing on the date of the incident. The rape kit also included the clothes the victim was wearing on the date of the incident, except for the underwear. The victim had showered prior to presenting at the SANE unit.
 {¶ 19} Ms. Klingensmith acknowledged one inconsistency in her report and one error. The inconsistency was between her recordation of the narrative given by the victim and the last page of the report which is a chart which sets forth the specifics of the rape. One version indicates that the victim gave the assailants oral sex and the other indicates the opposite. The chart in the report also indicates that anal penetration occurred when, in fact, it was only attempted. This error was *Page 8 
corrected upon a quality assurance review of the report and corrected in an addendum. She was aware of the inconsistency but could not correct it because the original of the last page of the report had already been sent to the police lab with the rape kit.
 {¶ 20} Ms. Klingensmith acknowledged that the victim referred to some past incidents of abuse but she did not ask her any details about the abuse and/or if the victim's current injuries could have been caused by that abuse. Ms. Klingensmith indicated that the injuries she observed on the victim were recent.
 {¶ 21} Ms. Klingensmith did not make a determination as to whether the victim was under the influence of drugs or alcohol because she presented to the SANE unit two days after the incident. She did not ask the victim if she was under the influence at the time of the incident although the victim told Ms. Klingensmith that she had met Defendant at a bar and tried to purchase marijuana from him. A delay in reporting a sexual crime is common. Only fifty percent of victims come to the SANE unit directly from the scene of the incident.
 {¶ 22} Finally, Ms. Klingensmith indicated that the victim told her the assailants wore condoms and she was not sure if a lubricant was used. Ms. Klingensmith acknowledged that a lubricant would not be needed if a person was self-aroused. She further acknowledged that it would be possible that trauma to the genital area would be caused by four men raping a victim without lubricant. However, Ms. Klingensmith also testified that she had seen many patients who have been raped and have no injuries. *Page 9 
2. Victim
 {¶ 23} The victim met the Defendant in the late summer of 2004. Her only contact with him was to obtain marijuana and cocaine and she did not know his last name. She would meet Defendant at a bar, AutoZone, her house or his house. The victim testified that she had never had sexual contact with Defendant prior to March 16, 2005, although he regularly flirted with her. The victim's younger sister, Crystal Hackett, also knew Defendant and the victim learned during the investigation of her rape that her sister had had a sexual relationship with Defendant.
 {¶ 24} In early 2005, the victim was dating her current fiancé Jason Miles, who was her boyfriend and roommate on March 16, 2005. She had previously been in an abusive relationship and Jason Miles helped her through that situation.
 {¶ 25} On March 16, 2005, the victim contacted Defendant to purchase marijuana for Jason Miles. She arranged to meet Defendant at Scorcher's restaurant on Waterloo Road around 8:00 p.m. She was to pick up Jason Miles from work at 9:30. She drove herself to Scorcher's and saw Defendant eating at a table with the co-defendants. She had never seen or met co-defendant Mingo but had seen the others. The Defendant told her that the marijuana was at a friend's restaurant that was being renovated. The victim then drove herself and Defendant to the restaurant. Defendant did not know the address at the time but knew the restaurant was on South Main Street next to a liquor store. *Page 10 
 {¶ 26} The victim testified that the restaurant was being renovated and the windows were covered with black trash bags. Immediately upon arrival, Defendant locked the door behind them and started hitting on her "like he always does." He said, "are you really going to make me wait?" Defendant then tried to pull her pants down and put his hand up her shirt. The victim testified that she repeatedly told Defendant no, reminding him that they both had significant others. He continued to try to touch her backing her up to an area of the restaurant that had an air mattress on the floor. Defendant then pushed her down on the mattress, took off his pants, and forced her to have sex with him by holding her down on the mattress with her hands across her chest. He did not wear a condom. She did not scream.
 {¶ 27} Defendant then rolled over and forced her to sit on top of him while he was holding her down by the thighs. Defendant's phone rang during the rape and he answered it, telling the caller "[y]eah, it is all good." She tried to get up while he was talking but was unsuccessful.
 {¶ 28} Eventually, Defendant permitted her to get up but would not let her get dressed. She was wearing a shirt and a vest and was naked from the waist down. Defendant told her she could not get dressed because she had "to take care of his friends now." He permitted her to go to the bathroom, which was towards the rear of the restaurant to wash up. She could not find a rear exit to escape. The victim indicated that she was very afraid of Defendant because she had seen him *Page 11 
put a gun to someone's head and push him up against a wall. She knew Defendant carried a gun in his car because she had seen it.
 {¶ 29} When she left the bathroom, she saw the co-defendants in the restaurant. There were four men including Defendant. The victim recognized one of the other men as being Defendant's uncle, Mark. She had seen the other two men in passing, but did not know them. The victim described the other two men as black males.
 {¶ 30} The victim testified that she told the Defendant, "I don't want to do this." The other men then started touching her and pushing her back towards the air mattress. She made another plea to Defendant but he ignored her. The other men heard her beg Defendant to let her go.
 {¶ 31} She was forced to give co-defendant Dick oral sex, but he could not obtain an erection. She did not have vaginal sex with co-defendant Dick. Co-defendant Castleberry forced her to have oral and vaginal sex and he ejaculated on the vest she was wearing. Co-defendant Mingo forced her to have oral and vaginal sex. She believed all of the men attempted to have anal sex with her and joked because she was so small. The victim believed the men wore condoms during vaginal, but not oral sex. During the entire incident, the men were laughing and passing around a blunt. Defendant was laughing, hitting her with a belt on the buttocks, and sometime restraining her while the other men raped her. The victim kept telling the men that they needed to let her go. The victim testified that she never had consensual sex with Defendant or any of the co-defendants. *Page 12 
 {¶ 32} After the men had finished, Defendant threatened her by telling her he knew where she lived. The victim testified that, at this point, the fact that the Defendant had a gun kept popping in her head. Eventually, the door was unlocked and she ran to her car. Defendant tried to come out the door after her but she was already driving away.
 {¶ 33} The victim then drove to pick up her boyfriend (Jason Miles) at work. She testified that Mr. Miles was really mad at her because she was late picking him up and gave her the silent treatment. She was crying but did not tell Jason what had happened because he was so mad and because she did not want to admit that she put herself in that situation. Jason did not ask her what was wrong.
 {¶ 34} When she got home that night she took a shower and tried to sleep, but could not. In the morning, she thought she should report the incident because she was afraid they would do it again. She finally told her sister (Crystal) what happened and later that same day, she told her boyfriend Jason.
 {¶ 35} The victim testified that she called the police on March 18, 2005. An officer came out and took a report and then told her to go to the SANE unit. She described the assailants to the officer and gave them the location where the rape took place. After the police officer left, the victim went to the SANE unit. Her sister put the clothing she was wearing on the 16th in a bag and brought it with them.
 {¶ 36} Several weeks later, Detective McFarland contacted her. She did not contact the police after her initial report because she was allowing them to do their *Page 13 
police work. Detective McFarland came to meet her at her office at which time she gave him the same information earlier given to the police and to the SANE unit. She then rode with the detective to identify the restaurant and the house where Defendant lived. On April 18, 2005, the police showed her several photo arrays and she identified Defendant and Mark Dick. She also identified the assailants now known as co-defendants Castleberry and Mingo from arrays shown to her on May 25, 2005. The victim identified the clothes she wore that night and gave to the SANE unit. The victim identified the Defendant and each of the co-defendants as being in the courtroom.
3. Officer Rowan
 {¶ 37} Officer Rowan responded to the victim's initial call to the police. The officers' testimony was as set forth in his report and was consistent with the victim's testimony at trial.
4. Crystal Hackett
 {¶ 38} Ms. Hackett was the victim's sister and roommate. Ms. Hackett testified that she knew Defendant as her sister's drug dealer. She had sexual contact with him on two occasions but did not tell her sister about them until after the rape. Her sister never told her that she thought Defendant was attractive, that she was interested in having sex with him or that she was afraid of Defendant. Her sister had told her that Defendant flirted with her.
 {¶ 39} Her sister was with Jason Miles when she returned to their home on the evening of March 16, 2005. Jason seemed upset but not angry. Her sister's *Page 14 
demeanor on that evening and the next day was very quiet and afraid as if something was wrong, but her sister would not tell her what was wrong. Eventually, Ms. Hackett convinced her crying sister to tell her what happened. The victim also showed Ms. Hackett the bruise on her buttocks. Ms. Hackett's testimony of the incident on March 16, 2005 was consistent with that of the victim.
 {¶ 40} Since the incident, her sister's behavior has changed. Her sister does not want to leave their house unless absolutely necessary. Her sister is tearful and afraid.
5. Jason Miles
 {¶ 41} Mr. Miles is the victim's fiancé. He was living with the victim, her sister (Crystal Hackett) and the victim's daughter at the time of the incident.
 {¶ 42} On March 16, 2005, he was scheduled to work until 10 or 10:30 p.m. and the victim was supposed to pick him up at work, but she was 30 minutes late. When she picked him up, the victim was crying and apologizing for being late. She told him she had been pulled over by the police for having a headlight out. Mr. Miles indicated that he was upset and aggravated because she was late. The victim continued to behave strangely the rest of the evening and the next day. The next day, he and the victim argued about the victim's behavior and she finally told him what happened. She was frantic and crying so hard she could barely speak. The victim called the police in his presence. He spoke to Detective McFarland. He also accompanied the victim to the SANE unit. *Page 15 
 {¶ 43} Mr. Miles knew Defendant and co-defendant Dick as being the victim's drug dealers. The Defendant called his and the victim's homes once as well. Other than this, he has never seen or spoken to Defendant. On the night in question, the victim was purchasing marijuana for him. The victim used to smoke marijuana but she had stopped all drug use prior to the date of the incident. Finally, Mr. Miles testified that since the incident, the victim's personality has changed.
6. Officer Kennedy
 {¶ 44} On May 13, 2005, Officer Kennedy accompanied Detective McFarland to the site of the incident to speak to an employee who was a suspect in a rape, co-defendant Castleberry. Mr. Castleberry denied knowing the victim after he was shown a photograph of her. Mr. Castleberry then gave the officers permission to take a buccal swab for DNA analysis.
 {¶ 45} On March 2, 2006, he and Detective McFarland spoke to and took a buccal swab from Defendant and arrested co-defendant Castleberry at Nephew's restaurant, which was then open for business. Co-defendant Castleberry had a gun in his possession at the time of his arrest. The officers also arrested co-defendant Dick on March 2, 2006.
 {¶ 46} Officer Kennedy acknowledged the accuracy of a photograph showing the back door of the restaurant to be near the restrooms, but he did not remember if an "exit" sign was in place and lit during his May 2005 visit. 7. Chad Britton *Page 16 
 {¶ 47} Mr. Britton is employed by the Ohio Bureau of Criminal Identification and Investigation in Richfield, Ohio ("BCI"). Mr. Britton works in the forensic biology department, which examines samples for the presence of bodily fluids. Mr. Britton examined the evidence in this case after the Akron police department brought it to BCI.
 {¶ 48} Mr. Britton identified the rape kit, which contained vaginal, rectal and oral swabs, a blood standard and the victim's underwear. The vaginal swab tested positive for semen and sperm and the rectal and oral swabs were negative. The victim's underwear also tested positive for semen, sperm and blood.
 {¶ 49} Mr. Britton also identified the victim's clothing. The victim's tank top, vest and jacket tested positive for semen. One of the stains on the jacket was in the middle of the back near the bottom.
 {¶ 50} He did not test the fingernail scrapings because protocol did not require it where there is other evidence, which they had in this case. His goal was to find DNA, which he had already found in other samples.
8. Lynda Eveleth
 {¶ 51} Ms. Eveleth is employed by BCI. She analyzed the evidence provided by the police department, as identified by Mr. Britton, for DNA. Ms. Eveleth tested the vaginal swab, underwear, tank top, vest, jacket and standards for the presence of the victim's, co-defendant Castleberry's and Defendant's DNA. The non-sperm DNA present on the vaginal swab and underwear were consistent with that of the victim. Sperm and non-sperm DNA present on the tank top, vest *Page 17 
and jacket were consistent with that of co-defendant Castleberry. Sperm DNA on the victim's underwear was consistent with that of Defendant. There was no sperm DNA detected in the vaginal swab that could be identified. All the samples provided were consistent with those of the victim, Defendant, co-defendant Castleberry and/or Jason Miles. There was no DNA standard submitted to her for co-defendant Mingo.
9. Detective McFarland
 {¶ 52} Detective McFarland was the lead detective on the case. He identified Defendant and the co-defendants in the courtroom.
 {¶ 53} His initial involvement with the case began on March 18, 2005, after he received a telephone call from Officer Rowan. The detective went to the SANE unit but the victim was still being examined upon his arrival. He gave his business card to the supervisor and asked her to have the victim call him on Monday.
 {¶ 54} Detective McFarland first spoke with the victim on April 13, 2005. The victim told him that the assault had occurred on March 16, 2005, although she did not report it until March 18, 2005. It is common for victims of sexual assault to delay reporting the matter. The victim told him that four men had assaulted her, that she was not wearing any panties on the night of the assault, that she had told Defendant she did not want to have sex with him because she had a boyfriend, and that she was afraid her boyfriend would not believe that she had been raped and/or if he did believe her that he would confront the assailants. Detective McFarland *Page 18 
testified that he knew from reading Officer Rowan's report the victim's identification of her assailants. The victim told him the incident had occurred at a restaurant on South Main Street, but she did not know the address. The victim's story to him was consistent with the narrative in the SANE report.
 {¶ 55} The victim identified the Defendant, Jason, as her supplier of drugs and Mark as Defendant's uncle. He identified Defendant as Jason Serva and "Mark" as Mark Dick through the police database and Defendant's address. The victim identified Defendant and co-defendant Dick from two photo arrays shown to her on April 18, 2005. The Detective put together four other photo arrays of men that might have been involved, but the victim did not identify any of these men.
 {¶ 56} On May 13, 2005, the detective went to the restaurant, which was still in the construction stage. He did not recall seeing an exit sign illuminated above the back door or a thumb bolt lock on the back door although he remembered seeing the back door. Co-defendant Castleberry reluctantly gave him a buccal swab.
 {¶ 57} On May 25, 2005, the officers presented the victim with two more photo arrays, containing the pictures of co-defendants Castleberry and Mingo. She identified both men and noted that she thought co-defendant Mingo had a gold tooth.
 {¶ 58} At a later date, he also obtained a buccal swab from the victim and Jason Miles, Defendant and co-defendant Dick. All swabs were submitted to BCI *Page 19 
for testing. Defendant and co-defendants Dick and Castleberry were all arrested on May 2, 2005. Castleberry was interviewed on the date of his arrest and his interview was tape recorded and transcribed and read into the record at trial.
 {¶ 59} During his interview, Castleberry initially denied that he knew the victim, denied that she had been in his restaurant and denied that he had sex with her. When confronted with the presence of his DNA on the victim, Castleberry admitted he had partied with Defendant and the victim and that the DNA must have been transferred when the victim shared his blunt. When confronted with the presence of his semen on the victim Defendant suggested that the victim must have lain on the air mattress in the restaurant where he had previously had sex with other women. Later, Castleberry admitted that the victim had given him oral sex but that it was consensual and her idea.
 {¶ 60} Castleberry testified that the Defendant and the victim left Scorcher's in the victim's car. He saw them a few hours later driving the victim's car and the victim was not in distress. She explained to him that both she and her sister used to date Defendant.
 {¶ 61} Castleberry then testified that the group returned to the restaurant and he rolled a blunt in the parking lot, which he shared with the victim. The victim never told him she was being taken advantage of and remained dressed at all times. Eventually, the victim left while on the phone with her boyfriend arguing. She was not upset when she left. *Page 20 
 {¶ 62} A few weeks later, Castleberry indicated that he heard over speakerphone a conversation between the victim's boyfriend, the victim, the victim's sister and Defendant. Jason Miles accused Defendant and Defendant's friends of raping the victim, which Defendant denied, explaining that he and the victim had been having a sexual relationship. Defendant then spoke to the victim and her sister. The victim asked Defendant why he told her boyfriend they were having a sexual relationship and Defendant replied because it was true. Defendant asked Crystal Hackett why the victim was lying and Ms. Hackett replied that she did not know why the victim said she was raped. Ms. Hackett also acknowledged that both she and her sister had been having a sexual relationship with Defendant. Defendant then told Castleberry that the victim was accusing them of rape because her boyfriend caught her cheating on him.
 {¶ 63} Co-defendant Dick told Detective McFarland that the victim voluntarily tried to give him oral sex on March 16, 2005, at the restaurant, but that he could not remain virile. Dick also told him that co-defendants Castleberry and Mingo were not there that night.
 {¶ 64} Defendant told Detective McFarland that he and the victim had consensual sex on March 16, 2005, at the restaurant. Defendant told him that co-defendants Mingo and Castleberry were not there that night.
 {¶ 65} Co-defendant Mingo turned himself in to the police. He had two gold teeth. The detective acknowledged that there is no physical evidence implicating co-defendant Mingo in the rape. He did not seek a buccal swab from *Page 21 
Mingo because the BCI agent had already identified all of the male DNA in the rape kit.
 {¶ 66} On cross-examination, Detective McFarland acknowledged that the victim did not tell him that she bought cocaine from Defendant; she used the word "drugs." She did not tell him she had used cocaine and/or that she had seen Defendant with a gun. She did not tell him that she had quit using marijuana prior to March 16, 2005, but she did tell him she was trying to buy it that night for her boyfriend. The detective also indicated that although he planned on obtaining Defendant and the victim's cell phone records as part of his investigation, he did not do so.
11. Eddie Ali
 {¶ 67} On behalf of co-defendant Castleberry, Eddie Ali, the owner of the premises located at 1809 N. Main Street testified that the exit sign above the back door was present and illuminated when he leased the premises to Castleberry in December of 2004. He also testified that the back door was functional and able to be easily unlocked and opened via a thumb bolt lock at the time Castleberry took possession of the premises. On cross-examination, Mr. Ali acknowledged that he only visited the property once per month, that Castleberry was renovating the property, and that he would not have been aware of any temporary conditions of the property.
 12. Kenta Mingo *Page 22 
 {¶ 68} Co-defendant Mingo testified in his own behalf. Mr. Mingo testified that he was at Scorcher's on March 16, 2005, with Defendant and the other co-defendants. The victim and Defendant left the restaurant with the keys to the restaurant. When Defendant did not return, he and the co-defendants got into Mingo's car and drove towards the restaurant crossing paths with Defendant and the victim in her car at the corner of S. Main Street and Waterloo. The victim turned her car around in a Speedway gas station and followed them to the restaurant. Everyone went into the restaurant except Mingo who remained in his car with Castleberry to smoke some marijuana.
 {¶ 69} When Mingo and Castleberry entered the restaurant shortly thereafter, they saw Dick and the victim dancing to the radio fully clothed and not touching. Dick and the victim went to the restroom to do some cocaine. Everyone smoked marijuana and Mingo went next door to the liquor store to buy a cigar so that they could roll another blunt. When he returned, he saw the fully-dressed victim giving oral sex to co-defendant Dick on the air mattress. After a few minutes, the victim and Dick started laughing and Dick stated that he "couldn't get it up." Everyone then started laughing, including the victim.
 {¶ 70} Mingo testified that the victim gave Castleberry oral sex while he and Defendant smoked the blunt. When the victim was finished with Castleberry, she and Dick returned to the restroom. Shortly thereafter, the victim rushed out of the bathroom telling them that she has to pick up her boyfriend. The victim *Page 23 
indicated that she had a good time and left. He, the Defendant, and the co-defendants all left together shortly thereafter.
 {¶ 71} Mingo denied having any sexual contact with the victim. He further denied seeing Defendant have any sexual contact with the victim. Mingo testified that he did not restrain or threaten the victim; he had no physical contact with her and never spoke to her the entire evening. Mingo acknowledged that he had two gold teeth.
 {¶ 72} At trial, Defendant argued that the State's testimony, particularly the victim's, was inconsistent and simply not worthy of belief. He argued that the victim, the Defendant and the co-defendants were simply partying. The sex that occurred between Defendant and the victim that night was entirely consensual and the victim accused Defendant of raping her to hide the secret relationship she had been having with Defendant from her boyfriend and her sister, the latter of which also had a sexual relationship with Defendant. In support of his position that the sexual contact was consensual, Defendant pointed out that the victim did not scream, she did not go for help from someone at the liquor store next door. Defendant Mingo testified that he saw Defendant and the victim driving in her car after which they all returned to the restaurant. The victim never indicated that she was being held against her will or had been raped.
 {¶ 73} Defendant further argued that the victim's story about the gun was not credible and did not cause her to be afraid of Defendant. She voluntarily went with him to the restaurant. She testified that the gun incident was a "joke," and *Page 24 
Detective McFarland testified that the victim never told him about the incident with the gun.
 {¶ 74} Finally, Defendant argued that despite the fact that the victim indicated that Defendant's phone rang in the middle of the rape and that Defendant answered that phone call and invited the co-defendants to come to the restaurant, Detective McFarland did not subpoena Defendant's telephone records. These records would have shown if that phone call actually took place and the pattern of communication between the parties before and after March 16, 2005.
 {¶ 75} On appeal, Defendant argues that the jury clearly lost its way in that it acquitted co-defendant Mingo who testified that he never saw Defendant have any sexual contact with the victim. Moreover, Defendant argues that all of the evidence presented at trial was consistent with consensual sex, including, but not limited to the fact that the victim suffered no real physical injury.
 {¶ 76} Based on our review of the entire record, we conclude that Defendant's criticisms of the State's case and the victim's testimony in this case are inadequate to prove that the jury lost its way and created a manifest miscarriage of justice. That the jury believed Mingo about his lack of sexual contact with the victim is not dispositive of the rape charge against Defendant. That Mingo did not see the assault does not mean that it did not occur. Moreover, the BCI agent testified that she has seen rape cases where there were even fewer physical injuries than that sustained by the victim here. *Page 25 
 {¶ 77} We find it reasonable that the jury believed the State's version of the events, disbelieved the Defendant's version and convicted him accordingly. We conclude that the conviction is not against the manifest weight of the evidence and overrule Defendant's assignment of error.
Judgment Affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
LYNN C. SLABY
FOR THE COURT
 WHITMORE, J. *Page 26 
 CARR, J. CONCURS *Page 1