[Cite as *State v. Balinski*, 2022-Ohio-3227.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,            :

                             No. 110929

    v.                             :

RAYMOND BALINSKI,                        :

    Defendant-Appellant.           :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 15, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-643692-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carl J. Mazzone, Assistant Prosecuting Attorney, *for appellee.*

Law Office of John T. Forristal and John T. Forristal, *for appellant.*


EILEEN A. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant Raymond Balinski appeals his conviction for domestic violence after a bench trial before the Cuyahoga County Court of Common Pleas. He contends that his conviction was not supported by sufficient evidence and

was against the manifest weight of the evidence.  For the reasons that follow, we affirm the conviction.

## I.  Factual Background and Procedural History

{¶ 2}  On December 11, 2019, a Cuyahoga County Grand Jury indicted Raymond Balinski for three counts of rape, one count of attempted rape, one count of felonious assault and one count of domestic violence.  Each of the rape, attempted-rape and felonious-assault charges carried a notice of prior conviction and a repeat-violent-offender specification.  The domestic-violence charge also carried a notice of prior conviction.  The charges all related to alleged conduct with a woman named K.K. between April 27, 2019 and July 30, 2019.

{¶ 3}  At the time the indictment was filed, Balinski was in federal custody.  After lengthy pretrial proceedings, the case proceeded to a bench trial on July 8, 2021.

### The State's Case

{¶ 4}  The state presented one witness at trial — K.K.

{¶ 5}  K.K. testified that she has lived at the same address in Cleveland for "pretty much" her entire life, including from April through August 2019.  She said she lived on the bottom floor of a duplex.  She said her parents lived on the upper floor of the home and she had a lot of contact with them.

{¶ 6}  K.K. testified that during the spring and summer of 2019, she worked as a caregiver in a nursing home.  She said she did not have a driver's license, so her father drove her to work every day.

{¶ 7} K.K. said that in February or March 2019, she met Raymond Balinski on the social-media platform Facebook. She said that they communicated through Facebook and they also spoke over the phone. She testified that she told Balinski where she lived and they both expressed romantic interest in each other. K.K. testified that Balinski came to her house in April 2019 after "a couple weeks" of talking with him, and she invited him in. K.K. said they talked and had consensual sex that evening and Balinski stayed the night.

{¶ 8} K.K. testified that Balinski stayed at her house the next day, too. She said Balinski told her that "he had no place to go and he was going to work real close to my house so he was just going to stay at my house." K.K. said that she and Balinski slept on the same futon that night without engaging in any sexual activities.

{¶ 9} K.K. testified that in the morning of the next day, she told Balinski he could not stay with her and he had to leave. She said she told him that he could not live with her "unless you live here and pay rent." She said Balinski responded, "Oh, I'll pay rent." She testified that this statement did not change her opinion about Balinski staying in her home. K.K. testified that Balinski then went to work. She admitted that her parents were home while Balinski was at work but she did not go upstairs and tell her parents that a man intended to live with her against her wishes.

{¶ 10} K.K. testified that she allowed Balinski back into her home when he returned that day. She said that she did so "[b]ecause I was scared of him, just the way he was. * * * Because of the way he would call me and talk to me and he was very moody." K.K. also said that she was aware that Balinski had left some items in

her home, "so I figured he had to come back and pick up his tools and his bag." K.K. testified that she told Balinski to leave but he did not leave.

{¶ 11} K.K. described the next several months with Balinski as "87 days of hell." She testified that while Balinski was living with her, she "pretended like everything was okay, but it was awful." Specifically, she described the following:

> So he would jump on top of me and he would look at porn on his phone and then he would have sex with me, and I mean hard. I'm saying two, three, four times a day. I would go to work, he would call me and I'd have to take [a] picture of me at work, send him pictures of when I would be going to and from work. I would leave every day with my dad because he drove me and we'd go to Marc's and get a bite to eat, maybe stop at the ATM, maybe stop and get something, get to work a few minutes early just to have that 10, 15 minutes for myself.

> So I would be at work and he was constantly texting and calling me, accusing me of cheating on him, sleeping with people at my work. I would come home; he would jump on top of me. I would come home and sometimes he would inject his finger up inside my vagina and twirl it to see if I had sex with anyone else while I was at work. He did that multiple times. And then he would make me — he would have a bath drawn for me and force me to go in the bathtub and do other things to him, too.

> He also wouldn't let me smoke cigarettes and when he would light them, he would smoke my cigarettes and throw them at me when they were lit.

> He also had me buy him drugs at 2, 3, 4 in the morning, use my money and go buy him drugs. When I'd return home, he would check me for his crack cocaine on my whole body, in my hair and everywhere on my whole body, and then he would say I took some of the drugs and he would jump on top of me and put his hand over my mouth and I couldn't breathe and then beat me so bad in my stomach that I had broken ribs about three weeks after he was staying with me. I never went to the hospital because, one, I didn't have insurance; and two, I was scared that he would kill me or my family.

> He also threw me against the fridge, locked me in the bathroom. I would have to put a towel down. I'd turn on the bathtub and I would

sit there crying for help. Nobody could hear me. It's 2, 3 in the morning. I would try to run away; he would follow me.

He threw me in the closet in the extra bedroom. He would throw me in there. I had to sit in there and he was — I don't know if he was crazy or what — but he was not normal where he heard noises in the house and he thought someone was coming after me. Hallucinating. That's the word I'm looking for. But he would take it out on me and just beat me and punch me and hit me. I had a black eye; he hit my back. I couldn't even leave the house. Every time I left the house, he would run after me, grab me by my hair. I don't know how many times my hair was falling out. Just the bruises and the throwing.

I made phone calls for him — he would have me call to see if his urine was clean or dirty — and if I didn't make the right phone call, he would get crazy and pick me up and throw me and beat me up. But the sex was at least three to four times a day, daily, for 87 days when he was in my life.

{¶ 12} K.K. testified on direct examination that Balinski never used any physical violence to induce a sexual encounter with her but she said that no sexual encounters after the first couple times were consensual. On cross-examination, K.K. testified that Balinski "has used force," including "[p]ushing me down and getting on top of me and forcing me to have sex, that's — you can't move. * * * Screaming 'No.'" K.K. admitted that her parents, who lived upstairs from her, never heard screaming or reported this alleged screaming to anyone.

{¶ 13} K.K. testified that Balinski only hit her with his fists and arms; he never kicked her, head-butted her or used any other part of his body to hit her.

{¶ 14} K.K. testified that she had broken ribs on her left side in May or June 2019. She said the pain lasted for a month. She said she could not move and that it was hard to bend over, put on her shoes or do anything at work. She described that it was painful to get into and out of her father's car during that month. She admitted

that she did not go to a doctor, call the police or seek medical attention. She also admitted that she did not tell her parents when she was experiencing pain in her ribs. She said she did not seek medical attention because she was scared of Balinski. She said that Balinski became "a different person" when he was using drugs.

{¶ 15} K.K. testified that in addition to this pain in her ribs, she had bruising on her eye, back and arm.

{¶ 16} She said that Balinski gave her a black eye after he got mad and punched her. She said this happened while she was still working at the nursing home, but she wore a lot of makeup to cover up the bruise. K.K. identified three photographs that she had taken of herself at her work. In the photographs, K.K. is looking directly into the camera and has a visible bruise under her left eye. K.K. could not recall when she took these photographs, but she said they depict the same bruise and she took them on different days "probably in July." K.K. said that she provided these pictures to the police.

{¶ 17} K.K. testified that "some people at work" asked her about the black eye and told her not to go back home. But she said she was scared so she kept going back home. K.K. described her fear as follows:

> I was afraid for my life, my family's life, like I was just scared of him. You don't know him how I knew him, how he was controlling. I couldn't even go to the bathroom by myself. I couldn't go do laundry. I couldn't go to the store by myself. I was only allowed to go to work and back home. I couldn't even go to sleep at night. He would grab me, pick me up by my hair and I would be up all night with him. And the next day he would wake up and do the same things all over again. It was a nightmare.

{¶ 18} K.K. testified that she developed bruises on both of her arms. She identified a photograph that she had taken of her right arm at work; the photograph depicts a bruise on an arm. K.K. testified that she developed this bruise in July.

{¶ 19} K.K. testified that she had bruising on her back above her right shoulder. She identified a photograph she had taken of herself in the bathroom of her house. The photograph depicts a mirror reflecting K.K.'s back. A bruise is visible in the mirror on K.K.'s back, at her shoulder. K.K. testified that Balinski caused this bruise by punching her with his fists.

{¶ 20} K.K. admitted that she never confided in her father — who routinely drove her to work — about what she claims Balinski did to her. She further admitted that she never called the police from her place of employment to make a report. She also admitted that she willingly sent Balinski pictures of her chest between April and July 2019.

{¶ 21} K.K. testified that she bought "crack cocaine" for Balinski while he lived with her. When the prosecutor asked K.K. about her own use of illegal substances on direct examination, K.K. testified as follows:

Q: At any point in time, did you use any illegal substances with Mr. Balinski?

K.K.: Yes.

Q: What substance did you use?

K.K.: The crack cocaine when we were in the bathroom, and then alcohol.

* * *

Q: And do you recall when that lone time you consumed the crack cocaine, when in this period of time this was?

K.K.: It was the whole time.

Q: No, you, personally.

K.K.: Oh, myself? Just a couple times, because he would buy it and do it all. He would grab it from me and then he would just do it all.

* * *

Q: How many times did you use the crack cocaine with Mr. Balinski?

K.K.: Really never. It was once or twice. It was a quick hit and I never really did it anyways because I didn't know how to do it.

Q: Was it your own choice to use that crack cocaine?

K.K.: No.

* * *

Q: Why did you consume the drugs?

K.K.: Because he locked me in the bathroom and when we were in the bathroom together, it's kind of like I inhaled some of it.

Q: So when you said you inhaled some of it, did you physically put —

K.K.: No, no.

Q: — the crack cocaine pipe in your mouth and take an inhale, or was this secondary?

K.K.: Secondary.

{¶ 22} On cross-examination, defense counsel continued the line of questioning, and K.K. testified as follows:

Q: And you were using drugs?

K.K.: No.

Q: Well, you indicated on your direct examination that you used — you smoked crack cocaine.

K.K.: It was surroundings.

Q: Well, first you said you smoked it and then later you said you got it through secondhand smoke.

K.K.: Right.

Q: So were you using crack cocaine?

K.K.: No.

* * *

Q: * * * Now you're saying you didn't use any crack?

K.K.: Right.

{¶ 23} K.K. further testified on cross-examination that she did not use powder cocaine while Balinski lived with her. Defense counsel impeached that testimony by offering to play a recording of her telling a police officer that she had been sober for 13 months but had ingested a line of cocaine. K.K. said it was not necessary to play the recording because she believed that she did say that.

{¶ 24} K.K. further admitted that she tested positive for methamphetamine, but she claimed that this was a "false positive" and she never used methamphetamine.

{¶ 25} K.K. testified that she went to the police about Balinski on July 26, 2019. She said that she waited to go to the police until Balinski "left to go back to prison." She said that at that time "I knew I would be safe" and "I knew he couldn't come after me."

{¶ 26} On cross-examination, K.K. admitted that she told the police officer during this encounter "that the sex was consensual but [Balinski] would take control." K.K. further admitted that the officer discussed potential charges with her and she told the officer that she did not "like" the rape charge because Balinski was her boyfriend.

{¶ 27} K.K. identified herself in still images taken from a police body-worn camera during her interaction with police on July 26, 2019. These images depict the bruises on K.K.'s right arm and back from the police camera's point of view. One of the images bears a date stamp indicating that the image was taken on July 26, 2019. K.K. admitted that the police officer asked her to go downtown to have more photographs taken but she did not do so.

{¶ 28} K.K. testified that a detective from the police department's sex-crimes unit followed up with her sometime between a couple days and a week after she made her initial report.

{¶ 29} K.K. testified that Balinski called her numerous times and sent "hundreds and hundreds of letters" to her after he entered federal custody.

{¶ 30} On cross-examination, K.K. at first testified that she did not communicate with Balinski while he was in federal custody. When defense counsel asked about a three-way call involving K.K. and Balinski, K.K. admitted that she did talk with Balinski once after he entered federal custody.

{¶ 31} K.K. identified five letters she received from Balinski while he was in custody. The letters contain Balinski's statements, including the following:

JULY 27, 2019:  I gotta talk about something that is Important!  When we butted heads I never thought you would have bruised like that — and I'm wrong — but some how, it hurts me more to see the results of not the damage we have done but more what we could have done positive[.] * * * I'm sorry for everything I have done to hurt you including physical shit — No Excuse or reason[.]

JULY 31, 2019:  I know I was cruel abusive & unfair but I was so frustrated & scared — which is no excuse but took a hold of me.

AUGUST 1, 2019:  I miss you so much and regret how I treated you * * *. Thank you[] for putting up with my * * * abusive ways. * * * Anyways never again trying to control you with me holding you down and telling you to shut up.  I was wrong baby and it hurts me now thinking back how I hurt you[.]

AUGUST 10, 2019:  I DO LOVE YOU and I'm sure a lot of people would disagree [especially] after I head butted you — which I regret very much[.]  I was wrong all the way around the board.

AUGUST 4, 2020:  I love you so thats what I'll go by! until otherwise. Saw the pictures you took of yourself nice black eye [K.K.] — I never ever hit your face whats up with that!

{¶ 32} The trial court admitted the photographs that K.K. had taken of herself and the two still images from the police body-worn camera, over the defense's objection.[1]  The court admitted, without objection, the letters K.K. said Balinski had sent her after he entered custody.  The court also admitted, without objection, certified court records from the Elyria Municipal Court documenting that Balinski had a prior conviction for domestic violence from 1996.  Balinski stipulated that the Elyria records related to him.

{¶ 33} The state then moved for a nolle prosequi as to Count 4 (attempted rape) and moved to amend Count 5 from felonious assault to attempted felonious

---

[1] Balinski does not challenge this evidentiary ruling on appeal.

assault. The defense did not object to either request and the court modified the indictment accordingly.

**Balinski's Motion for Judgment of Acquittal and the Defense Case**

{¶ 34} At the close of the state's case, Balinski moved for acquittal pursuant to Crim.R. 29(A), arguing that the state had failed to present sufficient evidence to support a conviction on any of the offenses with which he had been charged. As to the domestic-violence count, Balinski argued that it is not clear how K.K. obtained the bruises depicted in the photographs or when K.K. developed those bruises. The trial court denied the motion.

{¶ 35} Balinski called one witness in his defense — Arnaldo Torres, a sergeant in the Cleveland Police Department's Sex Crimes Unit. Torres testified that he had been with the sex-crimes unit since January 2019. He said he was not a detective until he received that assignment; he had been "basically a computer guy" before becoming a detective. Torres said he interviewed K.K. on July 30, 2019. He admitted that he did not take any photographs of K.K.'s home, did not seek to interview K.K.'s parents, did not seek to interview K.K.'s coworkers and did not seek to interview Balinski. He testified that he did speak with one of K.K.'s neighbors but he did not document about what he and the neighbor spoke.

{¶ 36} The defense then rested and Balinski renewed his Crim.R. 29(A) motion for acquittal. The court denied the motion.

**The Verdict, Sentence and Appeal**

{¶ 37} After deliberating, the trial court found Balinski guilty of domestic violence and found that Balinski had a prior conviction for domestic violence. The court found Balinski not guilty of the remaining counts.

{¶ 38} The trial court proceeded directly to sentencing after rendering its verdict. The court announced a sentence of 17 months on the conviction and granted credit for the approximately 425 days Balinski spent in pretrial custody.

{¶ 39} Balinski appealed his conviction and assigned two errors for our review:

> Assignment of Error No. 1: The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(a), on the charges, and thereafter entering a judgment of conviction of the offense as those charges were not supported by sufficient evidence, in violation of defendant's right to due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution.

> Assignment of Error No. 2: Appellant's conviction is against the manifest weight of the evidence.

## II. Law and Analysis

### A. First Assignment of Error — Sufficiency of the Evidence

{¶ 40} Balinski contends that the state did not present sufficient evidence to support a conviction for domestic violence. He says the trial court should have granted his Crim.R. 29(A) motion for acquittal on that count.

{¶ 41} A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13. Crim.R. 29(A) mandates that the trial court issue a judgment of acquittal where the state's

evidence is insufficient to sustain a conviction for an offense. Crim.R. 29(A) (the trial court "shall order the entry of a judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses"); *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134, ¶ 21. Accordingly, we apply the same standard of review to a trial court's denial of a defendant's motion for acquittal as we use when reviewing sufficiency of the evidence. *Id.* at ¶ 21 ("Crim.R. 29(A) and sufficiency of evidence review require the same analysis."), citing *Cleveland v. Pate*, 8th Dist. Cuyahoga No. 99321, 2013-Ohio-5571, ¶ 12.

{¶ 42} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state has met its burden of production at trial. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law. *Thompkins* at 386.

{¶ 43} An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt. *See, e.g.*, *State v. Bankston*, 10th Dist. Franklin No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's

witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). The appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 44} The elements of an offense may be proven by direct evidence, circumstantial evidence or both. *See, e.g., State v. Wells*, 8th Dist. Cuyahoga No. 109787, 2021-Ohio-2585, ¶ 25, citing *State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). "Direct evidence exists when 'a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish.'" *Wells* at ¶ 25, quoting *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Circumstantial evidence is "evidence that requires 'the drawing of inferences that are reasonably permitted by the evidence.'" *Wells* at ¶ 25, quoting *Cassano* at ¶ 13; *see also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37 ("[C]ircumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind."). Circumstantial evidence and direct evidence have "equal evidentiary value." *Wells* at ¶ 26, citing *State v. Santiago*, 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12.

{¶ 45} Balinski argues that "[t]here is absolutely no evidence" that he harmed K.K. We readily find sufficient evidence in this record.

{¶ 46} Under Ohio law, a person commits the crime of domestic violence by "knowingly caus[ing] or attempt[ing] to cause physical harm to a family or household member." R.C. 2919.25(A).

{¶ 47} Here, K.K. testified that Balinski lived with her in her home from April through July 2019. K.K. said that during these "87 days of hell," Balinski punched her, beat her up, grabbed her hair, threw lit cigarettes at her and threw her into a refrigerator and into a closet. She testified that he hit her so hard in the stomach that she had trouble breathing and was in pain for a month. She said he got mad and punched her, causing a black eye. She testified that he punched her in July 2019, causing a bruise on her back; the existence and timing of this injury was corroborated with a photograph she took of herself and a police body-worn camera.

{¶ 48} A conviction may rest solely on the testimony of a single witness, if believed. *See, e.g.*, *State v. Flores-Santiago*, 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 38; *State v. Dudley*, 9th Dist. Summit No. 28364, 2017-Ohio-7044, ¶ 10. K.K.'s testimony that Balinski was cohabiting with her and caused and attempted to cause her physical harm in the ways she described was sufficient to sustain Balinski's conviction. *See State v. Bagwell* 8th Dist. Cuyahoga No. 107922, 2019-Ohio-3187, ¶ 5, 23 (victim's testimony that the defendant lived with her in a duplex and smacked her face hard enough that she "saw stars" was sufficient to sustain a domestic-violence conviction, even in the absence of a visible injury);

*Cleveland v. Amoroso*, 8th Dist. Cuyahoga No. 100983, 2015-Ohio-95, ¶ 7, 30–31 (victim's testimony that her husband lived with her, punched her in the throat, twisted her arm and "grabbed [her] up against the wall" was sufficient to sustain a domestic-violence conviction, even in the absence of a visible injury).

{¶ 49} While K.K.'s testimony was sufficient on its own to sustain the conviction, we note that her testimony was corroborated by photographs that she took of herself and by images from a police body-worn camera.

{¶ 50} As the state's evidence was legally sufficient to support a guilty verdict on the domestic-violence count, the trial court correctly denied Balinski's Crim.R. 29(A) motion as to that count. We therefore overrule Balinski's first assignment of error.

### B. Second Assignment of Error — Manifest Weight of the Evidence

{¶ 51} Balinski contends that his conviction is against the manifest weight of the evidence.

{¶ 52} A manifest-weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion at trial. *See, e.g., State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26 (citing *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541 (1997)); *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13.

{¶ 53} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "thirteenth juror" and may disagree with the factfinder's resolution of conflicting testimony. *Thompkins*

at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S. Ct. 2211, 72 L.Ed.2d 652 (1982). The reviewing court must examine the entire record, weight the evidence and all reasonable inferences that may be drawn from the evidence, consider the witnesses' credibility and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). In conducting this review, this court remains mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the trier of fact to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraphs one and two of the syllabus. Reversal on manifest-weight grounds is reserved for the "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *Martin*, *supra*.

{¶ 54} Balinski argues that K.K.'s testimony is not credible, and he says there is a lack of corroborating evidence for her story. He argues that K.K. did not seek medical attention for any alleged injuries and did not tell her parents about the alleged abuse, despite them living upstairs from her and despite being alone with her father every day when she rode with her father to work. Balinski points out that K.K. admitted to using crack cocaine and alcohol with him. He argues that K.K.'s testimony was inconsistent, including with respect to her drug use, communications with police and communications with Balinski after he entered federal custody. Balinski argues that "[s]o many things simply do not add up" in the state's case, and

he points out that the trial court "obviously did not believe" substantial portions of K.K.'s testimony because it acquitted Balinski of numerous counts.

{¶ 55} In reviewing the record, there are some inconsistencies in the state's case and in K.K.'s testimony. For instance, the state introduced Balinski's written statements that he head-butted K.K., but K.K. testified that Balinski never head-butted her. K.K. testified on direct examination that Balinski never used physical force to compel sexual conduct, but on cross-examination she said he did use physical force to make her have sex. K.K. also inconsistently described her own drug use, at first saying that it was "a quick hit" of crack cocaine once or twice and then saying she was just around Balinski when he was smoking crack cocaine and did not use it herself. She also acknowledged that she told the police officer that she used powder cocaine, despite her testimony that she never used powder cocaine. The trial court surely factored the inconsistencies in the evidence into its verdict acquitting Balinski of all but the domestic-violence count.

{¶ 56} In looking at the record as a whole, though, we cannot say that Balinski's domestic-violence conviction was against the manifest weight of the evidence. A defendant is not entitled to reversal merely because certain aspects of a witness's testimony are inconsistent or contradictory. *E.g., State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38 ("'A conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony.'"), quoting *State v. Asberry*, 10th Dist. Franklin No. 04AP-1113, 2005-Ohio-4547, ¶ 11; *State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286,

¶ 37 ("'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render [a] defendant's conviction against the manifest weight or sufficiency of the evidence.'"), quoting *State v. Nivens*, 10th Dist. Franklin No. 95AP09-1236, 1996 Ohio App. LEXIS 2245 (May 28, 1996).

{¶ 57} K.K.'s testimony was consistent in many material respects. She testified about various physical injuries Balinski caused her and these injuries were documented in photographs. A police body-worn camera documented the bruise on K.K.'s back, which K.K. said Balinski caused by punching her in July 2019. K.K. also testified that Balinski threw lit cigarettes at her, threw her into a refrigerator and into a closet, held her down and pulled her hair.

{¶ 58} K.K. reported the physical abuse promptly after Balinski self-reported to federal custody, when she knew he would no longer be living with her. The timing of this report is consistent with K.K.'s testimony that she was afraid of Balinski.

{¶ 59} Moreover, Balinski apologized in writing for head-butting K.K. and acknowledged that he caused her bruising. He wrote to her, "I'm sorry for everything I have done to hurt you including physical shit * * *." He called himself abusive several times in his letters. When referring to the photographs of K.K.'s bruised eye, Balinski did not claim that he never hit K.K.; instead, he wrote, "I never ever hit *your face* * * *[.]" (Emphasis added.).

{¶ 60} After a thorough review of the record and after considering Balinski's appellate arguments, we cannot say that this is an exceptional case where the trier

of fact clearly lost its way and created a manifest miscarriage of justice such that a conviction must be reversed.  We, therefore, overrule Balinski's second assignment of error.

## III.  Conclusion

**{¶ 61}** Having overruled each of Balinski's assignments of error for the reasons stated above, we affirm his conviction for domestic violence.

It is ordered that the appellee recover from the appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

EILEEN A. GALLAGHER, PRESIDING JUDGE

MICHELLE J. SHEEHAN, J., and
LISA B. FORBES, J., CONCUR