[Cite as *State v. Cunningham*, 2025-Ohio-44.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,          :

    v.                                   :

ROMEL CUNNINGHAM,                :

    Defendant-Appellant.      :

No. 113796

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 9, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-689419-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and John Dowling, Assistant Prosecuting Attorney, *for appellee.*

Gayl M. Berger, *for appellant.*

EILEEN A. GALLAGHER, A.J.:

{¶ 1} Romel Cunningham ("Cunningham") appeals his conviction for having a weapon while under disability arguing that there is insufficient evidence to sustain his conviction, his conviction is against the manifest weight of the evidence and he received ineffective assistance of trial counsel. Although a majority of this panel

finds that Cunningham's conviction is against the manifest weight of the evidence, because there is a dissenting opinion, we are constrained to affirm the trial court's judgment pursuant to Ohio Const., art. IV, § 3(B)(3), which states in part as follows: "No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause."

## I. Facts and Procedural History

{¶ 2} On August 24, 2021, the Cuyahoga Metropolitan Housing Authority ("CMHA") Police Department received a call complaining that a man in a blue Nissan sedan, later identified as Cunningham, refused to leave the property of Tina Moore ("Moore"). Cunningham is the father of Moore's child. CMHA police arrived at the scene and approached the blue Nissan. Brian Rainey ("Rainey") was in the driver's seat, DeAnna Murdock ("Murdock") was in the front passenger seat and Cunningham was in the back seat, behind the driver. CMHA police ordered the three people out of the car and searched the vehicle. The officers found a gun under the front seat on the passenger's side. No arrests were made that night, but Murdock was charged with a gun-related offense and Cunningham was charged with menacing.

{¶ 3} On March 29, 2022, in Cuyahoga C.P. No. CR-22-668120-A and CR-22-668120-B, Murdock and Cunningham were indicted for improperly handling a firearm in a motor vehicle and carrying a concealed weapon. Cunningham was also indicted for aggravated menacing.

**{¶ 4}** On October 4, 2022, Murdock pled guilty to an amended misdemeanor count of carrying a concealed weapon and the felony charge of improperly handling a firearm in a motor vehicle was dismissed.

**{¶ 5}** On February 29, 2024, Cunningham was reindicted based on the events of August 21, 2021 charging him with having a weapon while under disability, carrying a concealed weapon, improperly handling a firearm in a motor vehicle and aggravated menacing in Cuyahoga County case number CR-24-689419-A. Cunningham's reindicted case is the subject of this appeal.

**{¶ 6}** On March 4, 2024, the original case against Cunningham, CR-22-668120-B, was dismissed without prejudice.

**{¶ 7}** On March 6, 2024, the case against Cunningham proceeded to a jury trial. On March 7, 2024, Cunningham was found guilty of having a weapon while under disability and aggravated menacing. The jury acquitted Cunningham of carrying a concealed weapon and improperly handling a firearm in a motor vehicle. The court sentenced Cunningham to 30 months in prison for the weapons conviction and 180 days in prison for aggravated menacing, to run concurrently to each other but consecutive to a prison term Cunningham was serving in a separate case.

**{¶ 8}** Cunningham appeals and assigns three errors for our review.

I. Appellant's conviction for having a weapon while under disability is against the manifest weight of the evidence.

II. There was insufficient evidence to support appellant's conviction for having a weapon while under disability.

III. Appellant was denied his Sixth Amendment right to effective assistance of counsel.

## II. Trial Testimony and Evidence

### a. Tina Moore

{¶ 9} The parties agreed that Moore would testify "via video conference." Moore testified that Cunningham is the father of her six-year-old child. Moore and Cunningham were in an "off and on" relationship "for about maybe five years," beginning when Moore was 19 years old. According to Moore, she and Cunningham lived together at various times throughout their relationship and, at the time of this incident, they were living together on Woodhill Road in Cleveland, Ohio.

{¶ 10} On August 24, 2021, Moore and Cunningham's child was playing and "he end up smacking Romel Cunningham" and Cunningham "smacked him back." Moore started "yelling, talking crazy," calling Cunningham a "child molester" and Cunningham left. As he was leaving, Cunningham said, "I've got something for you and I'm going to come back." According to Moore, Cunningham "came back later on that night." Moore testified as follows about what happened next:

> When he came back, he was talking outside. I was upstairs watching TV. He was talking outside. I really couldn't understand what he was saying because my TV was up. He started kicking on my door, like, trying to break it down.
>
> The last thing I remember him saying was I'm about to start letting off shots. When he said that, I instantly called the police. I ran upstairs, put my son in the bathroom, and we just closed the door until the police came.

{¶ 11} Moore testified that she did not see Cunningham's face when he was outside her apartment and he never "got into" her apartment that night, although

"he tried." Moore did not see Cunningham with a gun that night. Asked if she believed Cunningham's "threat" that he was "about to start letting off shots," Moore testified as follows:

> Yes, I did because I have a mailbox and my mailbox is outside my apartment and when you open the mailbox from the outside, you can, basically, use your arm and stick it through there and open the other side to see my living room. So it was easy for him to do that. I automatically assumed that that's what he was going to do, so, yes, I called the police.

{¶ 12} Moore testified that she and Cunningham "have had domestic cases before" and she was fearful for both her life and her son's life. Moore further testified that she did not see or hear anyone else outside of her apartment that night.

{¶ 13} According to Moore, she knows Murdock through their mutual relationships with Cunningham. Moore testified that she and Murdock had no issues with each other "until this incident."

{¶ 14} Moore testified that she does not live in Ohio anymore "[b]ecause of this incident. My son was traumatized from, I want to say, four to six months. He was afraid to go downstairs. He was afraid to do anything. I just felt like it wasn't worth it."

{¶ 15} On cross-examination, Moore testified as to why she and Cunningham were fighting that night. "Like I said, my son smacked him and then he smacked my son back. And during that moment as a mother, I got mad, I got angry, I was saying stuff, like, that's why you ain't the real daddy. I was just really saying stuff out of anger and he took it to heart so he wanted to leave."

{¶ 16} Moore testified that, although she did not see Cunningham when he came back to her apartment that night, she heard his voice. According to Moore, Cunningham kicked the door "trying to get in" leaving "a small hole in the side" of the door. Moore explained that Cunningham was "staying" with her at the time, "but he didn't have any proof that he was staying there. He didn't have no pieces of mail, anything like that." Moore further testified that Cunningham had a key "in the beginning" but she "took it back . . . before this incident had happened."

{¶ 17} Moore testified that she did not see a gun or hear any shots fired that night but she was afraid that Cunningham would shoot into her apartment. "He doesn't claim my son anymore. He's told other people that he was going to bar me and my son up in that house. He never cared for my child."

### b. Noelle Roberts

{¶ 18} Noelle Roberts ("Roberts") testified that she is a police officer for CMHA. On the night of August 24, 2021, Roberts responded to a dispatch call concerning "a male with a firearm knocking at [the] door" of a property at the Woodhill Estate Apartments, which is part of the region that CMHA covers. Roberts explained that the dispatch call included a description of a "[m]ale with a gun, black shirt, light-colored jeans and a blue Nissan." Roberts arrived at the scene and observed the blue Nissan. Other officers arrived and they "stopped the vehicle." Roberts "learned that the other officers located a firearm in the vehicle." Roberts "conferred with the female, Murdock, about the firearm in the vehicle."

{¶ 19} On cross-examination, Roberts testified that she "briefly" spoke with "the resident." Roberts did not recall if she noticed "any signs that would appear as if somebody was trying to break in." According to Roberts, she was "not on scene" when the other officers found the firearm in the vehicle and she did not know where exactly the firearm was found.

### c. James Sanders

{¶ 20} James Sanders ("Sanders") testified that he is a police officer for CMHA. On the night of August 24, 2021, Sanders was called to the Woodhill Estates "for a person refusing — a person refusing is somebody that's a caller called in saying that somebody is at their house and they don't want them to be there." Sanders' testimony continued:

> While in route, my dispatcher advised us that there was a male screaming in through the mailbox slide of her home and threatening to kick in the door. She stated that the male also had a firearm and he was threatening to shoot — just threatened to shoot.

> While we were still in route, our dispatcher still on the line with our caller advised that they're currently leaving and in a blue Nissan sedan. Upon our arrival, another officer observed the vehicle leaving the area and another officer initiated a traffic stop on the vehicle.

{¶ 21} According to Sanders, Murdock was the front passenger of the car, Rainey was driving and Cunningham was in the back seat. The occupants were taken out of the car and the vehicle was searched. Sanders testified that "[o]ne of the officers located a black Hi-Point 9 Millimeter firearm underneath the front passenger seat of the vehicle" and that the weapon was loaded with one round of ammunition in the chamber and seven rounds in the magazine. The State

introduced into evidence two photographs of the "firearm underneath the front passenger seat" and Sanders identified the gun as the one found in the blue Nissan sedan.

{¶ 22} Sanders testified that he spoke with Murdock that night and that Murdock admitted ownership of the gun. Sanders testified that no arrests were made that night.

{¶ 23} Under cross-examination, Sanders testified that, according to the police report he wrote that night, Cunningham was sitting "in the rear left seat of the vehicle" and the gun was found underneath the front passenger seat of the vehicle where Murdock was sitting. According to Sanders, he did not know whose fingerprints were on the gun nor did he know whether a "DNA evaluation" was performed. Sanders further testified that no gunshot residue was found on Cunningham "because there wasn't any reports of any actual shooting."

{¶ 24} Sanders testified that Murdock and Cunningham were "charged in this case" but Rainey was not. According to Sanders, "We charged [Cunningham] with menacing at that time" and Murdock was charged with "a gun-related offense." Sanders further testified that, initially, Cunningham was not charged with "a gun-related offense."

{¶ 25} On redirect-examination, Sanders testified that he is not the person who makes the decision of who is "formally charged" or with what crimes. According to Sanders, once a police supervisor has approved an officer's report, "the detective bureau will then take that police report to a prosecutor to work on charges."

### d. DeAnna Murdock

{¶ 26} Murdock testified that she works "with special needs adults and children that have behavioral and mental issues." Murdock testified that she has been friends with Cunningham "for about eight years" and was aware that Cunningham had fathered a child born to Moore.

{¶ 27} On August 24, 2021, Murdock received a phone call from Cunningham because he and the "mother of his child was arguing and he needed to go and pick up his clothes." At the time, Murdock was at work and Cunningham was watching her two children. Murdock additionally testified that Cunningham had her car. It was dark when Murdock got off work and she and Cunningham went to Moore's, with Cunningham driving Murdock's car. Asked if anyone else was in her car that night, Murdock answered, "Yes" and testified that her "play brother" Rainey was in the car as well as her two children. Murdock testified as follows about what happened when they arrived at Moore's house:

> Okay. So when we got there, [Cunningham] gets out of the car. He goes up to . . . Moore's house. He also goes there to get his things that I was told. All I know is that we sat there for a minute, me and [Rainey], and the kids were in the car.
>
> We were all sitting there and I'll say, like maybe five, ten minutes went by and I heard a ruckus. I heard yelling and screaming. I look at [Rainey] and I said I'm going to get out of the car to see what is going on. I went to go approach the steps. I heard him yelling.
>
> I heard that he was also telling her to open the door, but she wouldn't open the door. And I was, like, well, she's not opening the door. Let's go. So he still yelling and arguing, so I go back to the car because also I wanted to make sure my children were okay.
>
> . . .

So he comes back to the car. He's running back to the car. At that time [Rainey] was in the front seat. [Cunningham] goes to the backseat . . . with the children and [Rainey] asked what happened. I also asked what happened and he was, like, we have to go.

And me and him are arguing back and forth because I was, like, why do we have to go if you were going to get your clothes? And before [Cunningham] tells him to pull off and before he gets to pull off, the police are coming and we hear the sirens. So as we're sitting in the car, [Rainey] was, like, well, what's going on? Why do you want to go? He was, like, we need to go.

The police end up coming behind us and as the — as they get out of the car, the police are yelling for us to put our hands up. We put our hands up and they start slowly approaching the vehicle. When they slowly approaching the vehicle, [Cunningham] is in the backseat. They're yelling put your hands up. I'm telling them that [Rainey] can't put his hands up all the way because his arm — his arm was in a sling so he couldn't put both his hands up.

So in the midst of that, [Cunningham] throws the gun into the front seat and it lands in between my seat and the floor. They start questioning everyone. [Cunningham] gets pulled out of the car and so then it's just me and [Rainey] in the car. They start questioning the both of us. They asked for licenses and everything like that. They asked whose vehicle it was. I told them it was my vehicle. They pulled — they said they have to search the vehicle because they heard there was a gun involved.

I told them that I did not know exactly what was going on. All I was here for was to be a mutual party and come here because he wanted his clothes. So they searched the vehicle. They find the gun. They pull me outside of the vehicle. I told them that I was not aware that the gun was in the vehicle. They asked who the gun was registered to and I told them that it was registered to me and my home. And they asked, well, how did the gun get here? I told them I was not present of the gun being here. I told them that it was in a lock box, supposed to be in a lock box in my home.

{¶ 28} Asked if she "had no knowledge of the gun being in the car or anywhere," Murdock answered, "Never knew the gun was in the car until he threw it at the very last minute before the police started questioning everyone." Murdock

further testified that, when they "first go to the scene," she did not see a gun in the possession of either Rainey or Cunningham. Asked how Cunningham threw the gun, Murdock replied, "He was in the backseat. He tossed it and it fell and slid onto my side . . . of the vehicle." Murdock testified that Cunningham has been to her "house before because we once again had an arrangement for him to watch my kids while I was at work." Murdock testified that she did not give Cunningham "permission" to access the safe that day but agreed with the prosecutor that he had "access to the gun."

{¶ 29} According to Murdock, she pled guilty to a "gun charge" related to this case "because the gun was registered in my name." Murdock testified that she did not bring the gun into the car that night and she did not touch the gun. Murdock further testified that Rainey "wasn't aware" of the gun and, to her knowledge, he did not touch or hold the gun.

{¶ 30} On cross-examination, Murdock testified that Cunningham was at Moore's house on August 24, 2021. Murdock dropped her kids off at Moore's around 3:00 p.m. because Cunningham was watching them while she worked.

{¶ 31} Murdock testified that Cunningham picked her up from work at 11:00 p.m. Asked what happened after that, Murdock testified as follows: "He explains to me — well, [Rainey] was in the car. He explains to me that he had to go back to her house, that they had a disagreement and that he needed to get his stuff and I said okay. So we all got in the car and went to [Moore's] house." Murdock confirmed that her children were in the car at the time. Murdock testified that her children were

seven and four years old at the time and the younger one was in a "booster seat or car seat" located in the rear passenger's side of her car but later agreed that her children were six and four years old at the time of the incident. It is noted that there is absolutely no mention of the presence of children in the police reports or testimony, a fact which is of import.

{¶ 32} Defense counsel asked Murdock how the gun landed after Cunningham threw it and the following colloquy occurred:

A:      Like, it slid and it landed in between the seat, between me and the seat on the floor.

Q:      Okay.  So he's in the back and he tosses it in such a way where it lands underneath your seat?

A:      Yes.

Q:      Okay.  But you didn't touch it at all?

A:      No, I did not.

Q:      It just somehow landed perfectly underneath your seat?

A:      It was in between the seat and the console.

Q:      It was in between the seat and the console?

A:      Yes.  And the floor, also.

Q:      Okay.  So if the console is on my left here — let's pretend the podium is the console.

A:      Mm-hmm.

Q:      He threw the gun so it landed perfectly in between here (indicating)?

A:      Yes.

Q:      And that is where the police found it?

A:     Yes.

{¶ 33} According to Murdock, Cunningham watched her children "very often." Murdock further testified that sometimes Cunningham would watch her children at her house and sometimes it would be at Moore's house.

{¶ 34} Defense counsel asked Murdock to "go back to the gun" and explain how Cunningham threw it at her.

Q:     It landed perfectly between the seats?

A:     It wasn't at me. It was kind of, like, tossed it.

Q:     Tossed it?

A:     Yes.

Q:     Okay. It was perfectly between the console and the seat and the cops come and you admit that it's your gun?

A:     Yes, because they told me that it was registered in my name. They asked and I said, yes, that's my gun.

Q:     But you didn't see the gun?

A:     No, I did see the gun.

Q:     You didn't see it closely, though, did you?

A:     No.

Q:     How did you know it was yours?

A:     Because they showed me the gun.

Q:     After the fact?

A:     Yes.

Q:     Okay. So at the time you didn't know it was your gun?

A:     No.

{¶ 35} Murdock next testified about her two jobs, and the following colloquy took place:

Q:    They probably wouldn't like it if you had a felony on your record, right?

A:    Right.

Q:    You would probably lose your job?

A:    Yes.

Q:    And that would be very bad for you and your children?

A:    Yes.

Q:    So you would probably want to do anything that you could to make sure that you don't lose your job, right?

A:    Yes.

Q:    Because you love your kids?

A:    Yes.

Q:    And you can't have a felony on your record and you don't have a felony on your record, right?

A:    Right.

Q:    Because you took a deal?  You did, didn't you?

A:    Yes.

Q:    You took a deal so now you don't have a felony.  Was part of that deal to testify here today?

A:    Yes.

{¶ 36} On redirect-examination, Murdock testified that she and Moore "never got into it" because they both felt like Cunningham "was playing with the both

of us." Murdock further testified that she would not lie for Cunningham and she would not lose her job for him.

## III. Law and Analysis

{¶ 37} For ease of discussion, we address Cunningham's assignments of error out of order.

### a. Zoom Witness

{¶ 38} Preliminarily, we, sua sponte, address the issue of whether Moore's remote testimony violated Cunningham's right under the Sixth Amendment to the United States Constitution "to be confronted with the witnesses against him," which is often referred to as the Confrontation Clause. In Cunningham's original case, 668120, the State filed a motion to allow remote witness testimony related to Moore testifying "via teleconference" because she had relocated to Texas. This motion was filed on February 12, 2024, and the case was dismissed on March 4, 2024. The motion was unopposed and pending at the time of dismissal. In the reindicted case that is the subject of this appeal, no such motion was filed. Rather, the trial court noted on the record immediately prior to Moore's remote testimony that "[t]his is by agreement of the parties to allow testimony like this because she is . . . out of state."

{¶ 39} The United States Supreme Court has held that the Confrontation "Clause's ultimate goal is to ensure reliability of evidence . . . . It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford v. Washington*, 541 U.S. 36,

61 (2004). *See also* Ohio Const., art. I, § 10; *State v. Self*, 56 Ohio St.3d 73, 78 (1990) ("Our interpretation of Section 10, Article I [of the Ohio Constitution] has paralleled the United States Supreme Court's interpretation of the Sixth Amendment . . . ."). The Ohio Supreme Court has stated that the Sixth Amendment "encompasses the rights to have a witness physically appear in the courtroom, to require the witness to testify under oath, and to force the witness to be subject to cross-examination." *State v. Carter*, 2024-Ohio-1247, ¶ 27.

{¶ 40} In *Maryland v. Craig*, 497 U.S. 836, 844 (1990), the United States Supreme Court held that the Confrontation Clause does not guarantee "criminal defendants the absolute right to a face-to-face meeting with witnesses against them at trial." (Emphasis omitted.) Rather, "the Confrontation Clause reflects a preference for face-to-face confrontation at trial . . . ." *Ohio v. Roberts*, 448 U.S. 56, 63 (1980). This line of case law has developed to require courts to use an "interest-balancing framework" to make a "'case-specific finding' . . . that an exception to face-to-face confrontation" is necessary. *Carter* at ¶ 36. The court's finding must be "based on evidence presented by the parties" that the exception is "'necessary to further an important state intertest' or 'public policy' objective." *Carter* at ¶ 35, quoting *Craig* at 852.

{¶ 41} In *Carter*, the Ohio Supreme Court addressed the issue of whether the defendant's "right to face-to-face confrontation was violated because the trial court allowed a witness to testify remotely by way of video conference." *Id.* at ¶ 1. The *Carter* Court found that "the trial court erred by allowing the remote testimony.

Under United States Supreme Court precedent, a trial judge may only dispense with the requirement of face-to-face confrontation in narrow circumstances. But the trial court in this case did not make sufficient findings to establish that such circumstances existed." *Id.* at ¶ 2. The *Carter* Court further found that "the use of videoconferencing was harmless error" because, given "the other evidence presented at trial, there was no reasonable possibility that the trial court's error in allowing the remote testimony contributed to [the defendant's] conviction." *Id.* at ¶ 3.

{¶ 42} In *Carter*, the defendant was accused of sexual offenses against his adopted daughter. *Id.* at ¶ 4. At the defendant's jury trial, his former employer testified against him by video. *Id.* at ¶ 12. The State filed a motion to allow this video testimony and the defendant objected. *Id.* at ¶ 13. This witness lived in Minnesota at the time of Carter's trial, and the trial court found the COVID-19 pandemic, the uncertainty of "travel by air" and the unpredictability of the weather "rendered" the witness "'unavailable to testify in person' and that the video format would not hinder the defense's ability to cross-examine him." *Id.* at ¶ 13.

{¶ 43} The jury found Carter guilty of two counts of sexual battery but acquitted him of the remaining sexual offenses charged in the indictment. Carter appealed and the Third District Court of Appeals affirmed finding that "the combination of the pandemic and resultant airline-labor shortages were sufficient bases to justify the trial court's determination . . . ." *State v. Carter*, 2022-Ohio-4559, ¶ 18 (3d Dist.).

{¶ 44} The Ohio Supreme Court agreed with the defendant that "these findings at most recite potential weather-related inconveniences that could have hindered travel but did not necessarily prevent [the witness] from testifying in person." *State v. Carter*, 2024-Ohio-1247, ¶ 37. The Ohio Supreme Court further reasoned that the "trial court heard no evidence about winter weather patterns, delayed fights, aviation reports (concerning Ohio or Minnesota), road conditions, or airline-staffing shortages." *Id.* Additionally, the trial court's reasoning behind allowing the remote testimony "was not a '*case-specific* finding of necessity' . . . because erratic weather patterns and the delays they cause are equally relevant to *any* trial involving nonlocal witnesses." (Emphasis in original.) *Id.* The *Carter* Court additionally found that "the record does not establish that allowing [the witness] to testify remotely advanced an important state interest." *Id.* at ¶ 38.

{¶ 45} In applying this Confrontation Clause law to Cunningham's case, we find that no evidence was presented, and the trial court made no "case-specific finding," to show why it was "necessary" for Moore to testify remotely. Therefore, the trial court erred by allowing Moore to testify remotely.

{¶ 46} We are aware that the parties stipulated to Moore's remote testimony. "It is a well-established principle that Confrontation Clause rights, like other constitutional rights, can be waived." *State v. Pasqualone*, 2009-Ohio-1247, ¶ 14. Although we find the court erred, we find that this error is harmless in this case. The harmless-error doctrine is governed by Crim.R. 52(A), which states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall

be disregarded." In this case, Cunningham appeals his conviction for having weapons while under disability and Moore testified that she did not see Cunningham with a gun on the night of the incident. Therefore, any error associated with her remote testimony is harmless but we remind the trial courts that there is a protocol to follow before allowing remote testimony from a witness.

### b. Having a Weapon While Under Disability

{¶ 47} Cunningham was found guilty of having a weapon while under disability in violation of R.C. 2923.13(A)(2), which states that "no person shall knowingly acquire, have, carry, or use any firearm . . . if . . . [t]he person . . . has been convicted of any felony offense of violence . . . ." Pursuant to R.C. 2901.22(B), a "person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." Ohio courts have held that "to 'have' a firearm, one must either actually or constructively possess it." *State v. Ridley*, 2005-Ohio-333, ¶ 18, citing *State v. Hardy,* 60 Ohio App.2d 325, 327 (8th Dist. 1978). Constructive "[p]ossession of a firearm may be inferred when a defendant has exercised dominion and control over the area where the firearm was found. . . . Nevertheless, constructive possession cannot be inferred by a person's mere presence in the vicinity of contraband or the person's mere access to the contraband." *State v. Philpott*, 2020-Ohio-5267, ¶ 47 (8th Dist.).

### i. Sufficiency of the Evidence

{¶ 48} In Cunningham's second assignment of error, he argues that there was insufficient evidence to convict him of having a weapon while under disability. Specifically, Cunningham argues that Moore's testimony about where the gun landed after he allegedly tossed it from the back of the car to the front of the car, coupled with her testimony that neither she nor Rainey touched the gun that night, is inconsistent with where the police found the gun. We first note that inconsistent testimony does not factor into an analysis of the sufficiency of the evidence. *See, e.g., State v. Balinski*, 2022-Ohio-3227, ¶ 56 ("A defendant is not entitled to reversal merely because certain aspects of a witness's testimony are inconsistent or contradictory."); *State v. Nichols*, 2013-Ohio-3898, ¶ 13 ("Challenges to the sufficiency of the evidence based upon instances of inconsistent testimony, memory defects, and the like are witness credibility issues which are properly resolved by the trier of fact.").

{¶ 49} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the State has met its burden of production at trial. *State v. Hunter*, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law. *Thompkins* at 386.

{¶ 50} "An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable

juror of the defendant's guilt beyond a reasonable doubt." *State v. Balinski*, 2022-Ohio-3227, ¶ 43 (8th Dist.). *See also State v. Bankston*, 2009-Ohio-754, ¶ 4 (10th Dist.) ("[I]n a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the State's witnesses testified truthfully and determines if that testimony satisfies each element of the crime.").

{¶ 51} Murdock testified that Cunningham "tossed" the gun from the back seat into the front passenger seat area of the Nissan when he realized the police were approaching the vehicle. Additionally, Sanders testified that another police officer recovered the gun from "underneath the front passenger seat of the vehicle," which was corroborated by two photographs the State introduced into evidence showing the "firearm underneath the front passenger seat." Our review of these photographs shows the gun squarely underneath the front passenger seat of the Nissan.

{¶ 52} It was stipulated at trial that Cunningham was under disability in that he was convicted of a felony of violence on January 7, 2019, in Cuyahoga C.P. No. CR-17-616804-B.

{¶ 53} Upon review, we find that the State presented sufficient evidence that Cunningham knowingly had a firearm on August 24, 2021 and that he had a prior conviction of a felony of violence.

{¶ 54} Accordingly, Cunningham's second assignment of error is overruled.

## ii. Manifest Weight of the Evidence

{¶ 55} In Cunningham's first assignment of error, he argues that his conviction for having a weapon while under disability is against the manifest weight of the evidence. Specifically, Cunningham argues that the "jury lost its way in believing [he] ever had the gun and then in a rush to beat approaching police that [he] throws the gun so it lands perfectly shoved under the front passenger seat, as if to hide."

{¶ 56} A manifest weight of the evidence challenge attacks the credibility of the evidence presented and questions whether the State met its burden of persuasion. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.). Weight of the evidence "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *Thompkins*, 78 Ohio St.3d 380, at 386-387. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of . . . conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Furthermore, in *State v. Jordan*, 2023-Ohio-3800, ¶ 17, the Ohio Supreme Court held that "[s]itting as the 'thirteenth juror,' the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion."

{¶ 57} In a manifest weight challenge, the appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn

therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversal on manifest weight grounds is reserved only for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*

{¶ 58} It is undisputed that Murdock's gun was found underneath the front passenger seat of Murdock's car on the night of August 24, 2021 and that Murdock was, in fact, seated in the front passenger seat. Moore testified that she did not see Cunningham with a gun on the night of August 24, 2021. There is no forensic evidence in the record linking Cunningham to the gun found in the Nissan. The only evidence in the record that Cunningham "had" the gun that night is Murdock's testimony that Cunningham "tossed" it from the back of the car. Constructive possession of the gun is not at issue in this case, because there is no evidence in the record about who brought the gun into the car, who knew that the gun was in the car or who had control over the gun in the car. *See, e.g., Philpott* at ¶ 47 ("[C]onstructive possession cannot be inferred by a person's mere presence in the vicinity of contraband . . .").

{¶ 59} Murdock's trial testimony reflects that she never testified that she actually saw Cunningham throw the gun that night. Rather, she told the jury that, after Cunningham tossed the gun, it landed in the following locations:

"[I]t lands in between my seat and the floor";

"[I]t fell and slid onto my side . . . of the vehicle";

"Like, it slid and it landed in between the seat, between me and the seat on the floor";

Asked if the gun landed underneath her seat, Murdock answered, "Yes."

"It was in between the seat and the console";

"And the floor, also"; and

Asked if the gun landed "perfectly between the console and the seat," Murdock answered, "Yes."

{¶ 60} The crucial issue on appeal is whether Murdock's inconsistent testimony is believable because her testimony is the only evidence in the record that Cunningham "had" the gun. In *State v. Jordan*, 2023-Ohio-3800, ¶ 14, the Ohio Supreme Court instructed appellate courts to "consider[] whether the evidence should be believed" as part of a manifest-weight-of-the-evidence review.

{¶ 61} Murdock testified that she did not touch the gun that night. Murdock further testified that the gun landed in multiple locations such as between her seat and floor, that it "fell and slid" to her side of the vehicle, that "it slid and it landed" in between her and her seat "on the floor," that it landed "perfectly" in between the seat and the center console and that it landed underneath her seat. This testimony is wildly inconsistent thus rendering it unbelievable.

{¶ 62} Sanders testified that another police officer found the gun underneath the front passenger seat of Murdock's vehicle and the two photographs of the gun show the front passenger seat pushed all the way back and the gun tucked underneath the seat behind the bar used to slide the seat back and forth.

{¶ 63} Notwithstanding the multiple inconsistencies within Murdock's testimony about precisely where the gun landed, not to mention the implausibility of it landing perfectly underneath the seat behind the seat-adjustment bar after being "tossed" from the back of car without anybody else touching it, our review focuses on whether Murdock's inconsistent testimony, in toto, was believable. Because Murdock testified that the gun landed in at least five different precise locations between the center console, the front passenger seat and the floor, her testimony is inconsistent with Sanders' testimony that another officer found the gun underneath the seat and is inconsistent with the two photographs introduced into evidence showing the gun squarely underneath the seat behind the adjustment bar.

{¶ 64} Murdock also testified inconsistently that she did, and she did not, have sex with Cunningham. Murdock further testified that she was previously in a romantic relationship with Cunningham, but this "stopped" because of his infidelity. She testified that she would lose her jobs if she was convicted of a felony. Murdock additionally testified that she pled guilty to a misdemeanor in exchange for her testimony against Cunningham. Neither CMHA officer who testified mentioned anything about Murdock saying that Cunningham had the gun on the night of the offense. In fact, Murdock testified that when the police asked her how the gun got there, she told them she "was not present of the gun being here." Murdock also testified that her two young children and a car seat were in her Nissan that night when the police questioned the vehicle's occupants. However, neither CMHA officer who testified stated anything about children or a car seat in the vehicle that night.

Indeed, there is no evidence in the record about Murdock's children being at the scene other than her testimony.

{¶ 65} Additionally, Murdock testified that Cunningham had previously been to her house in order to watch her children but she did not testify that Cunningham was at her house on the day of this incident. Murdock also testified that she kept her gun in a lock box or a safe and, while she agreed that Cunningham had "access" to the gun, there is no evidence in the record that Cunningham had the means to open Murdock's safe, that he knew she kept her gun there nor that he did, in fact, access the safe that day. Indeed, there is no evidence in the record that Cunningham was at Murdock's house on the day of this incident. In fact, Murdock testified that she dropped her children off at Moore's house at 3:00 p.m. that day because that is where Cunningham was and he was set to watch Murdock's children while she worked.

{¶ 66} Moore, on the other hand, testified that Cunningham left her house that day after "smacking" their son and he did not come back until later that night when the incident at issue in this case occurred. Moore did not testify that Murdock dropped her children off at Moore's house at 3:00 that day, which is inconsistent with Murdock's testimony.

{¶ 67} We are aware that "a defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness' testimony are inconsistent or contradictory." *State v. Flores-Santiago*, 2020-Ohio-1274, ¶ 40 (8th Dist.). However, Murdock's testimony is not merely inconsistent. Rather, it is

riddled with internal inconsistencies, inherently biased and substantively unbelievable. Furthermore, her testimony that the gun landed anywhere other than all the way underneath the seat is inconsistent with Sanders' testimony and the photographs introduced into evidence. Her testimony that she dropped her children off at Moore's house on the day in question is inconsistent with Moore's testimony about what occurred that day. Additionally, Murdock's testimony that her children, one of whom was in a car seat, were in the car when these events occurred is simply unbelievable because neither police officer at the scene mentioned anything about children or a car seat being in the car at the time. In other words, in applying *Jordan's* mandate that we "consider[] whether the evidence should be believed," we find that Murdock's inconsistent testimony was not credible. And without Murdock's testimony, there is no evidence in the record that Cunningham possessed the gun found underneath the seat of Murdock's car. Following a thorough review of the record, including weighing the strength and credibility of the evidence presented and the reasonable inferences to be drawn therefrom, we find that this is one of those exceptional cases in which the trier of fact lost its way and created a manifest miscarriage of justice. The State failed to prove beyond a reasonable doubt that Cunningham knowingly had a firearm.

{¶ 68} Although the Ohio Constitution provides that a "majority of the judges hearing [an appeal] shall be necessary to render a judgment," it also states that "[n]o judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." Ohio

Const., art. IV, § 3(B)(3).  The Ohio Supreme Court has interpreted this section of the Ohio Constitution to be "a limitation on the power of a court of appeals." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997).  The *Thompkins* Court further held that one of the purposes of Ohio Const., art. IV, § 3(B)(3) "is to preserve the jury's role with respect to issues surrounding the credibility of witnesses" unless, of course, a unanimous panel "disagrees with the trier of fact's conclusion." *Jordan* at ¶ 17.

{¶ 69} Accordingly, because there is a dissent from our determination that the jury's verdict was against the manifest weight of the evidence in the record, the verdict must stand. *See generally State v. Peavy*, 2002-Ohio-5067 (8th Dist.).

{¶ 70} The dissent in this case goes beyond merely disagreeing with our conclusion that Cunningham's conviction for having weapons while under disability is not supported by the manifest weight of evidence in the record.  Rather, the dissent accuses the majority of "substitut[ing] its judgment for that of the trier of fact and impermissibly stack[ing] inferences upon inferences to reach its conclusion."  This is simply not true. Ohio courts have held that an appellate court "will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *State v. Bailey*, 2015-Ohio-2997, ¶ 63 (1st Dist.).

{¶ 71} As the dissent points out, it is inconsequential that there is no physical evidence linking Cunningham to the gun and that the jury reached inconsistent verdicts on the other firearm offenses.  Our conclusion that Cunningham's conviction for having weapons while under disability is against the manifest weight

of the evidence is based solely on Murdock's conflicting and, frankly, unbelievable testimony. It is patently apparent that the jury lost its way in this case.

{¶ 72} The dissent's conclusion that "the majority's interpretation of the record merely substitutes its judgment for that of the trier of fact" is based on a misunderstanding of our standard of review in manifest-weight-of-the-evidence challenges. Furthermore, the dissent's statement that our role in these challenges "is limited to the assessment of 'conflicting testimony'" is likewise unsupported by the law.

{¶ 73} In *Jordan*, the Ohio Supreme Court reminded us that a sufficiency-of-the-evidence challenge and a manifest-weight-of-the-evidence challenge "involve distinct legal concepts and different standards of review." *Jordan* at ¶ 15. "While both challenge the strength of the evidence, '[a] challenge to the sufficiency of the evidence attacks its adequacy . . . while a challenge to the weight of the evidence attacks its persuasiveness . . . .'" *Id.*, quoting *Disciplinary Counsel v. Smith*, 2017-Ohio-9087, ¶ 23.

{¶ 74} In *State v. Pountney*, 2018-Ohio-22, ¶ 19, quoting *State v. Jenks*, 61 Ohio 259, 260 (1991), the Ohio Supreme Court reiterated that "[w]hen reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed but, rather, whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" The *Pountney* Court further held that, because the challenge in that case was to the

sufficiency of the evidence, "[t]he issue . . . is not [the witness's] credibility or the persuasiveness of his testimony." *Id*. at ¶ 32.

{¶ 75} In contrast to a sufficiency challenge, a manifest-weight-of-the-evidence challenge is precisely about just that — the weight, credibility and persuasiveness of the evidence. Our job is to consider whether the evidence should be believed. And in this case, Murdock's testimony should not. Using explanation, examples, and other evidence in the record, we have methodically shown why Murdock's testimony was not persuasive and that the jury lost its way in convicting Cunningham of having weapons while under disability. We did not substitute our judgment for that of the jury's and we did not set forth a conclusory determination, without analysis, that the jury lost its way simply because Murdock's testimony was conflicting. Rather, we properly applied the law regarding a manifest-weight-of-the-evidence standard of review. We reviewed the entire record, weighed the evidence and all reasonable inferences, considered the credibility of the witness' testimony and, in resolving conflicts in the evidence, determined that the jury clearly lost its way and created a manifest miscarriage of justice. *See State v. Thompkins*, 78 Ohio St.3d 380 (1997); *State v. Wilson*, 2007-Ohio-2202; and *State v. Jordan*, 2023-Ohio-3800. *See also Tibbs v. Florida*, 457 U.S. 31, 46 (1982) (affirming the Florida Supreme Court's overturning the defendant's conviction "stem[ming] from the justice's determination that Tibbs' testimony was more reliable than that of" another witness. "This resolution of conflicting testimony in a manner contrary to the jury's verdict is a hallmark of review based on evidentiary weight . . . ."); *State v. Weaver*,

2022-Ohio-4371, ¶ 35 ("[A]lthough an appellate court must not reweigh the witness testimony when reviewing a [factfinder's] credibility determination, that *does not* mean it may skip reviewing a . . . credibility determination of a witness in the name of deference . . . .") (emphasis in original).

{¶ 76} The Ohio Supreme Court recently explained the relationship between the phrase "competent and credible evidence" and the manifest-weight-of-the-evidence standard of review in civil cases and, specifically, in termination of parental rights cases. *In re Z.C.,* 2023-Ohio-4703, ¶ 15. We find this explanation apropos to this criminal case because "neither the constitution nor statutes nor rules of procedure treat civil cases differently from criminal cases with regard to appellate review on the issues of sufficiency and manifest weight." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 17. The *In re Z.C.* Court cited with approval the following excerpt from *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984):

> The interplay between the presumption of correctness and the ability of an appellate court to reverse a trial court decision based on the manifest weight of the evidence was succinctly set forth in the holding of this court in *C.E. Morris Co. v. Foley Construction Co.*[, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978)]: "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."

In other words, Cunningham's conviction for having weapons while under disability is not supported by competent, credible evidence in the record going to all the elements of the offense.

{¶ 77} We agree with the dissent that "deference" must be given to the jury's determination of credibility.  But this deference cannot be insurmountable. Rather, it must be seen as a spectrum.  To hold otherwise would render appellate courts meaningless concerning the issue of manifest weight of the evidence. Inconsistent testimony that is patently not credible can be the foundation of a manifest-weight-of-the-evidence reversal and our determination that Cunningham's conviction is against the manifest weight of the evidence falls within the guardrails built around this standard.

{¶ 78} Accordingly,  pursuant  to  Ohio  Const.,  art.  IV,  §  3(B)(3), Cunningham's second assignment of error is reluctantly overruled.

### c.  Right to Effective Assistance of Counsel

{¶ 79} In Cunningham's third and final assignment of error, he argues that he was denied his Sixth Amendment right to effective assistance of counsel. Specifically, Cunningham argues that his counsel was ineffective for three reasons: "first, because he failed to elaborate on the inconsistent testimony as it regards the location of the gun in the vehicle, secondly, the attorney failed to elicit any testimony that specifically described the incident, and thirdly, he failed to impeach witnesses on any testimony."

{¶ 80} To succeed on a claim of ineffective assistance of counsel, a defendant must establish that his or her attorney's performance was deficient and that the defendant was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668 (1984).  However, "a court need not determine whether counsel's

performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* at 697. *See also State v. Bradley*, 42 Ohio St. 3d 136 (1989). Furthermore, when conducting a *Strickland* analysis, courts "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *State v. Spaulding*, 2016-Ohio-8126, ¶ 77, quoting *Strickland* at 689.

{¶ 81} Essentially, Cunningham argues that "there was simply not a strong line of questioning regarding the inconsistency" in Murdock's testimony about where the gun landed and "trial counsel was deficient in his approach to questioning" Moore. Cunningham then summarily concludes that the "lack of attention to [these details] had the real potential to change the outcome in the instant case."

{¶ 82} In *State v. Conway*, 2006-Ohio-2815, ¶ 101, the Ohio Supreme Court held that the "scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *See also State v. Quinones*, 2014-Ohio-5544, ¶ 25 ("[W]e will ordinarily refrain from second-guessing strategic decision counsel makes at trial, even where counsel's trial strategy was questionable.").

{¶ 83} Upon review, we find that defense counsel's cross-examination of Murdock and Moore was not deficient. In fact, defense counsel vigorously cross-examined both witnesses and brought out the inconsistencies and implausibility in

Murdock's testimony about where the gun landed. We further find that the scope of trial counsel's cross-examination was a trial strategy that cannot form the basis of an ineffective-assistance-of-counsel claim.

{¶ 84} Accordingly, Cunningham's third and final assignment of error is overruled.

{¶ 85} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

KATHLEEN ANN KEOUGH, P.J., CONCURS;
EILEEN T. GALLAGHER, J., DISSENTS (WITH SEPARATE OPINION)

EILEEN T. GALLAGHER, J., DISSENTING:

{¶ 86} I respectfully dissent from the majority's determination that appellant's conviction for having weapons while under disability is against the manifest weight of the evidence. In my view, the majority's interpretation of the

record merely substitutes its judgment for that of the trier of fact and impermissibly stacks inferences upon inferences to reach its conclusion.

{¶ 87} In assessing whether a conviction is against the manifest weight of the evidence, we examine the entire record, weigh the evidence and all reasonable inferences, and consider the witnesses' credibility. *Gerston v. Parma VTA, L.L.C.*, 2018-Ohio-2185, ¶ 58 (8th Dist.). When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the factfinder's resolution of the *conflicting testimony.* (Emphasis added.) *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). Thus, our role as the thirteenth juror is narrowly tailored and is limited to the assessment of "conflicting testimony."

{¶ 88} Relevant to this appeal, our analysis begins with the "presumption that the factfinder's determinations are correct." *Ohio v. Marneros*, 2021-Ohio-2844, ¶ 41 (8th Dist.); *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus ("[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts."). As emphasized by the Ohio Supreme Court in the landmark case of *Eastley v. Volkman*, 2012-Ohio-2179:

> "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. . . .'"

> "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'"

*Id.* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978). This principle is critical and recognizes that the deference traditionally afforded to those who are tasked to hear and observe the evidence presented at trial is a fundamental aspect of our judicial system that should not be easily overlooked or cast aside.

{¶ 89} The presumption in favor of the jury's verdict will not be overcome unless we find that the factfinder, when resolving the conflicts in evidence, "clearly lost its way and created such a manifest miscarriage of justice that the verdict must be overturned and a new trial ordered." *Illum. Co. v. Bosemann*, 2020-Ohio-3663, ¶ 28 (8th Dist.), quoting *Gerston,* 2018-Ohio-2185*,* at ¶ 58-59.  A reviewing court should find a conviction against the manifest weight of the evidence only in the "exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983); *State v. Lindsey*, 87 Ohio St.3d 479, 483 (2000).

{¶ 90} On appeal, appellant argues the jury clearly lost its way in convicting him of having weapons while under disability because (1) there was no physical evidence linking him to the gun discovered in the vehicle, (2) the jury reached conflicting verdicts on the remaining firearm offenses, and (3) Murdock's testimony was not believable.  I would find no merit to each of these propositions.

{¶ 91} First, it is well settled in this State that "'[a] lack of physical evidence, standing alone, does not render appellant's conviction against the manifest weight

of the evidence.'" *State v. Malone*, 2024-Ohio-5004, ¶ 54 (8th Dist.), quoting *State v. Flores-Santiago*, 2020-Ohio-1274, ¶ 37-38 (8th Dist.). Thus, "a conviction may rest solely on the testimony of a single witness." *See, e.g., State v. Malone,* 2024-Ohio-5004, ¶ 54 (8th Dist.). "'Even where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction so long as a reasonable [factfinder] could find the eyewitness testimony to be credible.'" *State v. Robinson*, 2014-Ohio-1624, ¶ 12 (8th Dist.), quoting *State v. Johnson*, 2014-Ohio-494, ¶ 52 (8th Dist.). Applying the foregoing, appellant's conviction is not against the manifest weight of the evidence simply because the State failed to present fingerprint or DNA evidence.

{¶ 92} Similarly, "[i]nconsistent verdicts on different counts of a multi-count indictment do not justify overturning a verdict." *State v. Hicks*, 43 Ohio St.3d 72, 78 (1989). "'The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count.'" *State v. Ford*, 2019-Ohio-4539, ¶ 347, quoting *State v. Adams*, 53 Ohio St.2d 223 (1978), paragraph two of the syllabus. "[J]uries can reach inconsistent verdicts for any number of reasons, including mistake, compromise, and leniency." *State v. Taylor*, 2008-Ohio-1626, ¶ 10 (8th Dist.). Thus, inconsistencies in the jury's verdicts "do[] not suggest that [the guilty] verdicts are against the manifest weight of the evidence and do[] not provide a basis for the reversal of [the] convictions." *State v. Cobb*, 2021-Ohio-3877, ¶ 87 (3d Dist.).

Consequently, appellant's disability conviction is not against the manifest weight of the evidence merely because he was found not guilty of carrying a concealed weapon and improperly handling a firearm in a vehicle.

{¶ 93} Finally, regarding the credibility of the State's witnesses, it is important to reiterate that the appellate court only sits as the thirteenth juror to resolve "*conflicting testimony*." Thus, "'although we sit as a "thirteenth juror," we nevertheless give "great deference" to the trier of fact.'" *Bedford Hts. v. Smith*, 2022-Ohio-3036, ¶ 17 (8th Dist.) ("*Thompkins* instruct[s] that the fact-finder should be afforded great deference."); *State v. Goodykoontz*, 2023-Ohio-3243, ¶ 33 (8th Dist.) ("The appellate court extends substantial deference to the jury's determinations on the credibility of witnesses."); *State v. Marshall*, 2021-Ohio-4434, ¶ 31 (8th Dist.) (rejecting the appellant's argument that we should afford the jury less deference when reviewing a manifest-weight-of-the evidence challenge). *See also State v. Weaver*, 2022-Ohio-4371, ¶ 28-29 (noting that appellate review of a defendant's convictions prohibits an appellate court from substituting its judgment for that of a jury's.).

{¶ 94} To be clear, the deference afforded to the trier of fact is not absolute. This court may reverse a verdict if, upon assessing "conflicting testimony," we find it is patently apparent that the trier of fact lost its way in arriving at its verdict. However, such a conclusion must rely on undeniable evidence in the record and not mere conjecture or disagreement with the trier of fact's acceptance of uncontradicted testimony. In other words, "we may not merely substitute our

judgment for that of the jury." *Smith* at ¶ 17; *see also State v. Bias*, 2022-Ohio-4643, ¶ 33 (10th Dist.); *State v. Brown*, 2021-Ohio-1674, ¶ 54 (6th Dist.); *State v. Foust*, 2005-Ohio-440, ¶ 28 (2d Dist.); *State v. Serva*, 2007-Ohio-3060, ¶ 8 (9th Dist.).

{¶ 95} Courts interpreting the language of *Thompkins* immediately following its release have provided persuasive guidance regarding the role of an appellate court when assessing a challenge to the credibility of a State witness. For instance, the Second District has articulated the following premise that has been adopted and applied approximately 880 times in this State:

> Because the factfinder, be it the jury or, as in this case, the trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. *The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.*

(Emphasis added.) *State v. Lawson*, 1997 Ohio App. LEXIS 3709, *4 (2d Dist. Aug. 22, 1997). "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." *Id.* "Consequently, we defer more to decisions on what testimony should be credited, than we do to decisions on the logical force to be assigned to inferences suggested by evidence, no matter how persuasive the evidence may be." *State v. Brooks*, 2007-Ohio-1029, ¶ 28 (2d Dist.), citing *Lawson* at *4.

{¶ 96} In this case, the majority ignores the foregoing directives by explicitly stating that appellant's conviction is against the manifest weight of the evidence because "Murdock's testimony was not credible." Respectfully, this issue remained within the province of the jury, and absent compelling, conflicting evidence, we are required to resolve every reasonable presumption in favor of the jury's verdict. *See Barberton v. Jenney*, 2010-Ohio-2420, ¶ 20 ("[T]he [witnesses] credibility remains an issue for the trier of the facts."), *State v. Diar*, 2008-Ohio-6266, ¶ 120, quoting *DeHass,* 10 Ohio St.2d 230 at paragraph one of the syllabus. Again, "[w]here reasonable minds can reach different conclusions upon conflicting evidence, determination as to what occurred is a question for the trier of fact. It is not the function of an appellate court to substitute its judgment for that of the factfinder." *State v. Jones*, 2021-Ohio-3311, 92.

{¶ 97} In this case, Murdock testified that appellant tossed a firearm into the front of the vehicle once he realized the vehicle was being stopped by the responding officers. Viewed collectively, Murdock's testimony undoubtedly created an inference that appellant had actual possession of a firearm while under disability. As noted in *Lawson*, the decision whether, and to what extent, to credit the testimony of Murdock was within the peculiar competence of the jury. Additionally, this court has repeatedly stated that a verdict is not against the manifest weight of the evidence merely because the factfinder chose to believe the State's witnesses or otherwise chose to believe some but not all of the testimony of a particular witness. *State v. Tate*, 2024-Ohio-5319, ¶ 77 (8th Dist.) ("'[A] conviction is not against the

manifest weight of the evidence simply because the jury rejected the defendant's version of the facts and believed the testimony presented by the state.'"), quoting *State v. Jallah*, 2015-Ohio-1950, ¶ 71 (8th Dist.); *State v. Ellis*, 2013-Ohio-1184, ¶ 18 (8th Dist.) (The jury, as the factfinder, "is free to believe all, some, or none of the testimony of each witness appearing before it."). These well-established guardrails to the manifest-weight-standard of review, which expressly prohibit appellate courts from serving as arbiters of truth, are not acknowledged by the majority's decision.

{¶ 98} For the sake of discussion, however, I recognize that members of this reviewing court could arguably find competing inferences from the evidence in the record, including (1) Murdock's testimony that she received a favorable plea deal in exchange for her testimony against appellant, and (2) Murdock's testimony concerning the location of the firearm when it was discovered by the responding officers. As held by the majority, these facts could arguably permit one to infer that (1) Murdock lied to protect her own interest; and (2) the gun could not have plausibly landed underneath the front seat of the vehicle if tossed from the backseat, and therefore, Murdock's testimony was not credible. In my view, however, such inferences cannot be preferred to the clear inference created by Murdock's unambiguous testimony that appellant had actual possession of the firearm, because they ignore the greater weight of the State's evidence.

{¶ 99} First, it is not uncommon for a witness to testify on behalf of the State pursuant to the terms of a negotiated plea agreement. Although the majority suggests that Murdock's pursuit of a favorable plea deal motivated her to present

false testimony against appellant to protect her own interests, it is at least as likely, and perhaps more probable, that she reluctantly agreed to provide truthful testimony against her friend to protect her own interests. To state otherwise is mere speculation that ignores the realities of criminal trials. Relatedly, the fact that Murdock did not immediately incriminate appellant at the scene of the traffic stop is of no significance. It is evident that Murdock shared a close relationship with appellant, and she had no incentive to voluntarily subject appellant to criminal punishment until the subsequent police investigation unfolded.

{¶ 100} Second, and perhaps most importantly, I am not persuaded by the majority's determination that it was not possible for the firearm to end up under the front seat of the vehicle if appellant tossed the gun forward as Murdock testified. In my view, this conclusion amounts to nothing more than an uncorroborated hunch. Without insurmountable evidence to suggest otherwise, it was certainly reasonable for the jury to conclude that an item thrown to the front of a vehicle might have plausibly fallen or otherwise slid under the front seat of the vehicle. Regardless, the jury was permitted to convict appellant while disagreeing with certain aspects of Murdock's testimony, such as any perceived inconsistencies in her testimony regarding where the gun landed or whether she touched the gun after it was tossed to the front seat. In turn, the jury was simultaneously free to believe her testimony that appellant threw the gun to the front of the vehicle to distance himself from the gun before the police arrived. Murdock was cross-examined at length on these issues, and the jury was in the best position to weigh her overall credibility.

{¶ 101} Finally, the majority's interpretation of the evidence supporting appellant's conviction also ignores other direct testimony establishing appellant's motive, his access to the firearm, and his opportunity to gain possession of the firearm on the day in question. At trial, Murdock testified that appellant had access to her gun on the day of the incident because he was watching her children while she was at work. (Tr. 422.) Similarly, Moore provided relevant insight into the events leading to the discovery of the firearm, stating that appellant threatened to fire a gun into her apartment during a verbal altercation. Although Moore could not observe appellant from inside her apartment, she testified that she took appellant's threat seriously. Viewing this evidence together with Murdock's testimony that appellant attempted to discard a firearm just moments after the verbal altercation with Moore concluded, I believe a reasonable juror could find that appellant had actual possession of a firearm while under disability on August 24, 2021. This is not the exceptional case where the defendant's conviction must be vacated to avoid a manifest injustice.

{¶ 102} Based on the foregoing, I would find appellant's conviction is not against the manifest weight of the evidence. Should this court continue to merely substitute its judgment for that of the trier of fact when considering a witnesses' credibility, it is my belief that reversal on manifest weight grounds will no longer be the exceptional case in this district.